FILED
2011 Nov-07  AM 10:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | |
|---|---|
| BARBER AUTO SALES, INC., individually and on behalf of all persons similarly situated, | CIVIL ACTION No.: 5:06-CV-04686-IPJ |
| Plaintiff, | |
| v. | Date:   December 5, 2011 Time:   11:00 a.m. |
| UNITED PARCEL SERVICES, INC., | |
| Defendant. | |

---

## OBJECTION OF BRANDY AND NOAH HEASER

---

Daniel Greenberg
Arkansas Bar # 2007-193
CENTER FOR CLASS ACTION FAIRNESS LLC
GREENBERG LEGAL SERVICES
55 Fontenay Circle
Little Rock, AR  72223
Telephone:  (501) 588-4245
Email:  dngrnbrg@gmail.com
(*pro hac vice* pending)

John J. Park, Jr.
Bar # ASB-8382-P62J
STRICKLAND BROCKINGTON LEWIS LLP
1170 Peachtree Street NE, Suite 2200
Atlanta, GA 30309
Telephone:  (678) 347-2208
Fax: (678) 347-2210
Email:  jjp@sbllaw.net

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ........................................................................................................... 1

I.      The Objectors Are Members of the Class. .................................................... 2

II.     The Court Has A Fiduciary Duty to Unrepresented Members of the Class. ............. 3

III.    This Settlement Is Impermissibly Self-Dealing. ........................................... 5

        A.      This Settlement Supplies $2 Million in Cash to the Class, $4 Million in Cash to Class Counsel, and $10 Million in Coupons and Injunctive Relief to Third Parties. ............. 6

                1.      The $10 Million Dimensional Weight Compensation Fund Is Illusory. ................. 8

                2.      The $10 Million Dimensional Weight Compensation Fund Cannot Benefit the Class. ................................................................................................. 9

                3.      The Injunctive Relief Is Illusory For—Not Compensatory To—the Class. .......... 10

        B.      This Settlement Contains Every One of *Bluetooth's* Three "Warning Signs" of Self-Dealing—And More. ........................................................ 13

                1.      Under *Bluetooth,* Fairness Prohibits Self-Dealing. ........................................ 13

                2.      The Settlement's Disproportionate Benefit to the Attorneys, Combined With Its Clear Sailing and Kicker Clauses, Are Indicants of Prohibited Self-Dealing. ......... 15

                3.      The "Kicker" Clause Constitutes A Breach of Duty to the Class Which Requires Rejection of the Settlement. ...................................... 17

                4.      The Settlement Also Contains Other Signs of Self-Dealing. .................................. 19

IV.     Intra-Class Conflicts Preclude the Certification of a Single Settlement Class. ............. 23

V.      The Notice Is Insufficiently Informative. ...................................................... 25

VI.     This Court Could Strengthen Eleventh Circuit Law by Incorporating ALI Standards. .......... 26

VII.    If the Court Approves This Settlement, It Nonetheless Cannot Approve the Fee Request. .. 31

        A.      The Notice Violates Rule 23(h). ............................................................. 31

        B.      The Fee Request Should Not Consume Two-Thirds of the Class's Recovery. .......... 31

VIII.   This Objection Is Brought In Good Faith. .................................................... 33

CONCLUSION ............................................................................................................. 35

PROOF OF SERVICE ................................................................................................. 38

## TABLE OF AUTHORITIES

<u>Cases</u>

*Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.*,
    52 F.R.D. 373 (D. Kan. 1971) .................................................................................30

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) .................................................................................................24

*Bennett v. Behring Corp.*,
    737 F.2d 982 (11th Cir. 1984) ..................................................................26, 27, 28

*Burke v. Wis. Inv. Bd.*,
    317 F.3d 1261 (11th Cir. 2003) ...............................................................................33

*Camden I Condominium Ass'n v. Dunkle*,
    946 F.2d 768 (11th Cir. 1991) .......................................................................... 32, 33

*Diaz v. Trust Territory of Pacific Islands*,
    876 F.2d 1401 (9th Cir. 1989) ...................................................................................4

*Ellis v. Edward D. Jones & Co.*,
    527 F. Supp. 2d 439 (W.D. Pa. 2007) .....................................................................29

*Fleury v. Richemont North Am., Inc.*,
    No. C-05-4525 EMC, 2008 WL 3287154 (N.D. Cal. Aug. 6, 2008) ..........................6

*FreeportPartners, L.L.C. v. Allbritton*,
    No. 04-cv-2030, 2006 WL 627140 (D. D.C. Mar. 13, 2006) ....................................32

*FreshKist Produce L.L.C. v. Choi Corp.*,
    362 F.Supp.2d 118 (D. D.C. 2005) ..........................................................................32

*Gottlieb v. Barry*,
    43 F.3d 474 (10th Cir. 1994) ...................................................................................32

*Grant v. Bethlehem Steel Corp.*,
    823 F.2d 20 (2d Cir. 1987) ......................................................................................14

*Grove v. Principal Mut. Life Ins. Co.*,
    200 F.R.D. 434 (S.D. Iowa 2001) ............................................................................28

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .......................................................................... 11, 14

*Holmes v. Continental Can Co.*,
    706 F.2d 1144 (11th Cir. 1983) ...................................................................... 4

*In re Aqua Dots Prod. Liab. Litig.*,
    654 F.3d 748, 2011 U.S. App. LEXIS 17039 (7th Cir. 2011) .................................... 19

*In re Bluetooth Headset Prod. Liab. Litig.*,
    654 F.3d 935, 2011 U.S. App. LEXIS 17224 (9th Cir. 2011) ...............................*passim*

*In re Domestic Air Transp. Antitrust Litig.*,
    148 F.R.D. 297 (N.D. Ga. 1993) ................................................................... 22

*In re Domestic Air Transp. Antitrust Litig.*,
    141 F.R.D. 534 (N.D. Ga. 1992) ................................................................... 25

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)............................................................ 3, 15, 28, 29, 30

*In re GMC Engine Interchange Litig.*,
    594 F.2d 1106 (7th Cir. 1979) .................................................................29-30

*In re Joint Eastern and Southern Dist. Asbestos Litig.*,
    982 F.2d 721 (2d Cir. 1992),
    *modified on reh'g on other grounds sub nom. In re Findley*,
    993 F.2d 7 (2d Cir. 1993) .......................................................................... 24

*In re Literary Works in Elec. Databases Copyright Litig. v. Thomson Corp.*,
    654 F.3d 242, 2011 U.S. App LEXIS 17026 (2d Cir. 2011) ...................................... 24

*In re Mercury Interactive Corp. Sec. Litig.*,
    618 F.3d 988 (9th Cir. 2010) ....................................................................... 31

*In re Relafen Antitrust Litig.*
    360 F.Supp.2d 166 (D. Mass. 2005) ................................................................. 3

*In re Skinner Group, Inc.*,
    206 B.R. 252 (N.D. Ga. 1997) ..................................................................... 4

*In re Smith*,
    926 F.2d 1027 (11th Cir. 2010)..................................................................... 4

*Johnson v. Comerica*,
    83 F.3d 241 (8th Cir. 1996) ....................................................................15-16

*Johnson v. Georgia Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ...................................................................... 33

*Leverso v. Southwest Bank,*
    18 F.3d 1527 (11th Cir. 1994) ................................................................ 26, 27

*Lobatz v. U.S. West Cellular of Cal., Inc.,*
    222 F.3d 1142 (9th Cir. 2000) ..................................................................... 19

*Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.,*
    834 F.2d 677 (7th Cir. 1987) ....................................................................... 29

*Mirfasihi v. Fleet Mortgage Corp.,*
    356 F.3d 781 (7th Cir. 2004) ................................................................. 10, 24

*Murray v. GMAC Mortgage Corp.,*
    434 F.3d 948 (7th Cir. 2006) ...................................................................... 25

*Nilsen v. York County,*
    400 F.Supp.2d 266 (D. Me. 2005) .............................................................. 28

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999) ..................................................................................... 23

*Petruzzi's, Inc. v. Darling-Delaware Co.,*
    880 F. Supp. 292 (M.D. Pa. 1995) ............................................................. 29

*Piambino v. Bailey,*
    757 F.2d 1112 (11th Cir. 1985) ................................................. 4, 14, 15, 16, 32

*Public Health Trust of Dade Cty. Fla. v. Lake Aircraft, Inc.,*
    992 F.2d 291 (11th Cir. 1993) .................................................................... 13

*Reynolds v. Beneficial Nat'l Bank,*
    288 F.3d 277 (7th Cir. 2002) ........................................................................ 3

*Riker v. Gibbons,*
    2010 WL 4366012 (D. Nev. Oct. 28, 2010) ................................................. 3

*Silber v. Mahon,*
    927 F.2d 697 (9th Cir. 1992) .................................................................. 3-4, 10

*Six Mexican Workers v. Arizona Citrus Growers,*
    904 F.2d 1301 (9th Cir. 1990) .................................................................... 32

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) ........................................................................ 5

*Swedish Hosp. Corp. v. Shalala,*
    1 F.3d 1261 (D.C. Cir. 1993) ...................................................................... 32

*Sylvester v. Cigna Corp.*,
   369 F.Supp.2d 34 (D. Me. 2005) ....................................................................................... 17

*Synfuel Technologies v. DHL Express (USA)*,
   463 F.3d 646 (7th Cir. 2006) ....................................................................... 6, 9, 11, 12

*Thorogood v. Sears Roebuck & Co.*,
   547 F.3d 742 (7th Cir. 2008),
   *vacated on other grounds*,
   -- S. Ct. --, 2011 U.S. LEXIS 4939 (2011) .................................................................. 14

*Torrisi v. Tucson Elec. Power Co.*,
   8 F.3d 1370 (9th Cir. 1993) ............................................................................................. 32

*True v. American Honda, Inc.*,
   749 F. Supp. 2d 1052 (C.D. Cal. 2010).............................................................. 4, 9, 11

*Waters v. Int'l Precious Metals Corp.*,
   190 F.3d 1291 (11th Cir. 1999) ..................................................................................... 32

*Weinberger v. Great Northern Nekoosa Corp.*,
   925 F. 2d 518 (1st Cir. 1991)..................................................................................... 16-17

*Whitson v. Heilig-Meyers Furniture*,
   CV-94-PT-0309-E, 1995 U.S. Dist. LEXIS 4312 (N.D. Ala. Feb. 9, 1995) ............................. 13

Rules and Statutes

28 U.S.C. §1712(a) ..............................................................................................................8, 31

Fed. R. Civ. Proc. 23..........................................................................................................*passim*

Fed. R. Civ. Proc. 23(a)(4) .........................................................................................12, 19, 24, 36

Fed. R. Civ. Proc. 23(e) ...................................................................................................... *passim*

Fed. R. Civ. Proc. 23(e)(5) ........................................................................................................21

Fed. R. Civ. Proc. 23(h)...........................................................................................................31

<u>Other Authorities</u>

AMERICAN LAW INSTITUTE,
     PRINCIPLES OF THE LAW OF AGGREGATE LITIG. §3.05, *comment a* (2010)........................ 26, 30

AMERICAN LAW INSTITUTE,
     PRINCIPLES OF THE LAW OF AGGREGATE LITIG. §3.05, *comment b* (2010)...............................15

AMERICAN LAW INSTITUTE,
     PRINCIPLES OF THE LAW OF AGGREGATE LITIG. §3.05(a) (2010) ......................................26-27

AMERICAN LAW INSTITUTE,
     PRINCIPLES OF THE LAW OF AGGREGATE LITIG. §3.05(a)(3) (2010) ........................................27

AMERICAN LAW INSTITUTE,
     PRINCIPLES OF THE LAW OF AGGREGATE LITIG. §3.05(b) (2010)..............................................27

AMERICAN LAW INSTITUTE,
     PRINCIPLES OF THE LAW OF AGGREGATE LITIG. §3.05(c) (2010) ...............................................4

Brunet, Edward, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U.
     CHI. LEGAL F. 403...........................................................................................................34

Eisenberg, Theodore & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action
     Litigation: Theoretical and Empirical Issues*, 57 VAND. L. REV. 1529 (2004) ....................30

Federal Judicial Center,
     *Manual for Complex Litigation* § 21.71 (4th ed. 2008) ......................................................16

Federal Judicial Center,
     *Manual for Complex Litigation* § 21.312 (2004) ...............................................................25

Frankel, Allison, *Legal Activist Ted Frank Cries Conflict of Interest, Forces O'Melveny and Grant &
     Eisenhofer to Modify Apple Securities Class Action Deal*, American Lawyer Lit. Daily
     (November 30, 2010) ........................................................................................................34

Jones, Ashby, *A Litigator Fights Class-Action Suits*,
     Wall St. J. (Oct. 31, 2011) ...............................................................................................33

Karlsgodt, Paul & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat
     to Approval*, BNA: Class Action Litig. Report (Aug. 12, 2011)..........................................34

Leslie, Christopher R., *The Significance of Silence: Collective Action Problems and Class Action
     Settlements*, 59 FLA. L. REV. 71 (2007)...........................................................................28

Report of the Third Circuit Task Force,
   *Court Awarded Attorney Fees*, 108 F.R.D. 237 (1985) .....................................................16

Rothstein, Barbara J. & Thomas E. Willging , *Managing Class Action Litigation: A Pocket Guide
   for Judges* § III.C. (2005).................................................................................................22

Silver, Charles, *Due Process and the Lodestar Method*,
   74 TULANE L. REV. 1809 (2000) .......................................................................................18

Zahorsky, Rachel M., *Unsettling Advocate*,
   ABA J. (Apr. 2011)........................................................................................................33-34

# INTRODUCTION

This is a settlement that benefits class counsel and defendant far more than it benefits the class. As such, it cannot be approved. This settlement sets aside $2 million for the class and $4 million for the attorneys who claim to represent it. One could say that class counsel's requested paycheck—two-thirds of everything it has procured for the class—is impermissible under this Circuit's 25% benchmark, but that would radically understate the severity of the problem that class counsel has created for this Court.

The remainder of the settlement is of little or no value to anyone in the class or outside of it. The settlement sets aside $10 million in credit coupons that, by design, do not benefit class members: anyone who wants a credit coupon must do business with the defendant twice more in order to receive one. The credit coupons, as well as the settlement's prospective relief, appear to contemplate that the defendant will continue the supposedly impermissible practices that originally prompted this lawsuit: furthermore, the additions of these provisions to this settlement creates forbidden conflicts of interest between some class members and others.

This settlement contains every single warning sign of self-dealing on the part of class counsel and defendant that recently caused another Circuit's appellate court to strike down a structurally similar one: namely, it contains a disproportionate benefit to class counsel, a "clear sailing" clause, and a "kicker" that sends unawarded attorneys' fees not to the class, but to the defendant. Furthermore, this settlement also contains onerous provisions that seem designed to dissuade and burden objectors: in particular, the requirement that either the objector or his or her counsel must personally appear at the hearing will lock the courthouse doors to most members of the class.

Some people object to settlements because they decide that the settlement insufficiently compensates the class. The Heaser Objectors do not, and cannot, make this claim. That is because the settlement provides so little information about the size of the compensation a class member might expect to receive that no potential objector has been provided the information that would be needed to make an informed judgment.

In short, this is an unfair and unreasonable settlement proposal that, for multiple reasons, must be rejected.

## I.    The Objectors Are Members of the Class.

Brandy Heaser and Noah Heaser have regularly done business with United Parcel Service ("UPS") in the past to ship packages from place to place within the United States. On occasion, UPS audited those packages and then determined that they had relatively newer and larger dimensions, thus resulting in a higher charge to the customer. Brandy Heaser's UPS account number is #850RE8 and Noah Heaser's UPS account number is #17F2Y8. The Heasers' address is 310 Washington Avenue SE, Eyota, Minnesota, 55934; their telephone is 507-799-0024.

Attached to this objection are separate documents (sworn affidavits and UPS receipts) that demonstrate the class membership of the Heasers. The Heasers are members of the settlement class, and they therefore have standing to object to the settlement. The Center for Class Action Fairness, LLC, and local counsel John Park represent them *pro bono*; their attorney, Center senior counsel Daniel Greenberg, will appear for them at the fairness hearing on December 5, 2011. With respect

to this action, the Center and Park do not represent any class members besides Noah and Brandy

Heaser; both of them object to this settlement, and neither has opted out of the class.[1]

## II.   The Court Has A Fiduciary Duty to Unrepresented Members of the Class.

"Both the United States Supreme Court and the Courts of Appeals have repeatedly

emphasized the important duties and responsibilities that devolve upon a district court pursuant to

Rule 23(e) prior to final adjudication and settlement of a class action suit." *In re Relafen Antitrust*

*Litigation*, 360 F. Supp. 2d 166, 192-94 (D. Mass. 2005), *citing inter alia Amchem Prods., Inc. v. Windsor*,

521 U.S. 591, 617, 623 (1997) ("Rule 23(e) protects unnamed class members from 'unjust or unfair

settlements' agreed to by 'fainthearted' or self-interested class 'representatives.'"); *see also Reynolds v.*

*Beneficial Nat'l Bank,* 288 F.3d 277, 279-80 (7th Cir. 2002) ("district judges [are] to exercise the

highest degree of vigilance in scrutinizing proposed settlements of class actions" prior to settlement).

"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the

rights of absent class members.... [T]he court cannot accept a settlement that the proponents have

not shown to be fair, reasonable and adequate." *In re General Motors Corp. Pick-Up Truck Fuel Tank*

*Prod. Liab. Litig.,* 55 F. 3d 768, 785 (3d. Cir. 1995) (quoting *Grunin v. International House of Pancakes,*

513 F.2d 114, 123 (8th Cir. 1975)). *See also Riker v. Gibbons,* 2010 WL 4366012, at *2 (D. Nev. Oct.

28, 2010). "A trial court has a continuing duty in a class action case to scrutinize the class attorney to

see that he or she is adequately protecting the interests of the class." Herbert Newberg & Alba

Conte, NEWBERG ON CLASS ACTIONS § 13:20 (4th ed. 2002). "Both the class representative and the

---

[1] This Court's Order of August 29, 2011, § 16, requires objectors and their attorneys to supply much of the information in this section.

courts have a duty to protect the interests of absent class members." *Silber v. Mahon,* 957 F.2d 697, 701 (9th Cir. 1992). *Accord Diaz v. Trust Territory of Pacific Islands,* 876 F.2d 1401, 1408 (9th Cir. 1989).

There should be no presumption in favor of settlement approval: "[t]he proponents of a settlement bear the burden of proving its fairness." *True v. American Honda Co.*, 749 F. Supp.2d 1052, 1080 (C.D. Cal. 2010) (*citing* 4 NEWBERG ON CLASS ACTIONS § 11:42 (4th ed. 2009)). *Accord* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010) ("*ALI Principles*"). "In reviewing the settlement the judge is called upon to be impartial and neutral, favoring neither the proponents of the settlement nor those who are opposed or absent." *In re Smith,* 926 F.2d 1027, 1028 (11th Cir. 1991) (quoting *Moore's Federal Practice, Manual for Complex Lit. 2d* § 23.14 at 160 (1986)).

In short, "[c]areful scrutiny by the court is 'necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense of the absent class members.'" *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1147 (11th Cir. 1983) (quoting *U.S. v. City of Miami*, 614 F.2d 1322, 1331 (5th Cir. 1980), *modified on other grounds*, 664 F.2d 435 (5th Cir. 1981) (en banc)). "Because of the potential for a collusive settlement, a sellout of a highly meritorious claim, or a settlement that ignores the interests of minority class members, the district judge has a heavy duty to ensure that any settlement is 'fair, reasonable, and adequate' and that the fee awarded plaintiffs' counsel is entirely appropriate." *Piambino v. Bailey,* 757 F.2d 1112, 1139 (11th Cir. 1985) (*Piambino II*). "Under Rule 23(e) the Court 'acts as a fiduciary who must serve as a guardian of the rights of absent class members.'" *In re Skinner Group, Inc.*, 206 B.R. 252, 259-60 (N. D. Ga. 1997) (citations omitted). For this reason, "the court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *Id.*

It is insufficient that the settlement happened to be at "arm's length" without express collusion between the settling parties; because of the danger of conflicts of interest, third parties must monitor the reasonableness of the settlement as well. "If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained." *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003). Courts must be "vigilant not only for explicit collusion," but also for "more subtle … warning signs" that class counsel's self-interest has trumped its obligations to fairly and adequately protect the interests of the class. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 2011 U.S. App. LEXIS 17224, *28-29 (9th Cir. Aug. 19, 2011).

## III. This Settlement Is Impermissibly Self-Dealing.

It is a commonplace for objectors to complain that a settlement is insufficiently large. But the focus of the Heaser objectors is quite different. Their concern is that the settling parties have designed a settlement which benefits class counsel and the defendant a great deal, but that betrays the interest of the class. To put it another way, the Heasers object that the architects of this settlement are asking this Court to approve an arrangement that benefits themselves, and unrelated third parties, at the expense of the class.

Class counsel and defendants are entitled to settle this case for $6 million (or, indeed, any reasonable amount). But whenever any class action settles for $6 million, it is the class—not class counsel—who should receive the lion's share of the money. This settlement's architects have turned that upside down: they have created a settlement in which class counsel receives $4 million, the class receives $2 million, and other claimants—unrelated to the class—receive $10 million. Because this

arrangement cannot be repaired by the Court, this settlement must be rejected unless and until the settling parties modify it.

**A.   This Settlement Supplies $2 Million in Cash to the Class, $4 Million in Cash to Class Counsel, and $10 Million in Coupons and Injunctive Relief to Third Parties.**

Only those who contracted with UPS to ship packages between May 15, 2006 and August 29, 2011 can qualify for membership in the class.[2] Settlement Agreement ("SA"), III.1.  At most, the class will receive, in sum, $2 million in compensation, which will come from the UPS-funded "Claims Made Class Fund." SA, at III.2.1. This refund will be payable by check or UPS credits. *Id.* If the sum of all valid claims on the fund exceeds $2 million, then claimants will only receive pro-rated shares. SA, at III.2.1.1.

The Settlement Agreement also provides for UPS's creation of a different $10 million fund, the "Dimensional Weight Compensation Fund," which will issue credit coupons[3] (not cash or

---

[2] More precisely, the Settlement Agreement specifies the final day of shipping, for purposes of class eligibility, as the date of the Preliminary Approval Order. This Court's "Order Granting Preliminary Approval of Proposed Settlement" was both dated and filed August 29, 2011.

[3] Although the proposed settlement is careful to avoid labeling the instruments produced by the Dimensional Weight Compensation Fund "coupons," the "credits" operate just like coupons: that is, the only way to benefit from a UPS credit is to use it to buy more shipping from UPS. To state the obvious, it is perfectly accurate to call the credits in the settlement agreement "coupons." *See Synfuel Tech. DHL Indus., Inc.*, 463 F.3d 646, 654 (7th Cir. 2006) ("a discount on a proposed purchase" is a coupon); *Fleury v. Richemont North Am., Inc.*, No. C-05-4525 EMC, 2008 WL 3287154, at *2 (N.D. Cal. Aug. 6, 2008) (a coupon settlement is one where the relief constitutes "a discount on another product or service offered by the defendant in the lawsuit"). These coupons do not operate as refunds, in which consumers get their money back: they are credits, which require consumers to continue doing business with UPS.

checks[4]) to UPS customers who receive an upward shipping charge for shipments made after the "Effective Date." Settlement Agreement, at III.2.3. The Effective Date cannot be known at this time, but that date cannot arrive until this Court both approves the settlement agreement and enters its final order of approval, and *either* the time for the filing of any appeals expires *or* the settlement and this Court's final order of approval are affirmed in all respects by the highest appropriate appellate court. SA, at II.16.

Finally, the Settlement Agreement requires UPS to disclose more about its business practices: the defendant will eventually have to discuss more directly and bluntly its "right to audit package dimensions and … make adjustments" upwards in price, its guidelines on how to "properly measure packages," its procedures "by which customers may request an adjustment," and so forth. SA, III.3.

For the purposes of the settlement, its creation of two funds—each with limited eligibility— necessarily creates three categories, or subgroups, of UPS customers. First, there are those who have done business with UPS in the past—the class members who are eligible for a pro-rated share of the $2 million Claims Made Class Fund. Second, there are those who will do business with UPS weeks or months or years in the future, who may be eligible for credit coupons from the $10 million Dimensional Weight Compensation Fund. Third, there are those who are doing business with UPS now[5]—on the day this objection is filed, for instance, or on the day of this action's fairness hearing—and the terms of the settlement leave them eligible for no compensation whatsoever. This

---

[4] Class members compensated by the Claims Made Settlement Fund are eligible for "a refund payable by check or credits to their UPS accounts." SA, III.2.1. The Dimensional Weight Compensation Fund, in contrast, allows customers to "receive a credit." SA, III.2.3.

[5] More precisely, after August 29, 2011 but before this settlement's Effective Date.

three-fold array of fractional compensation, credit coupon compensation, and no compensation at all contrasts sharply with the compensation of class counsel, who of course will shortly ask this court to approve a payment from UPS to class counsel of $4 million.

The resources—the cash, the credits, and the injunctive relief—that class counsel has procured from the defendant by means of this settlement are objectionable for several reasons.

1.      **The $10 Million Dimensional Weight Compensation Fund Is Illusory.**

There is no way to tell when, or if, the credit coupons from the Dimensional Weight Compensation Fund will ever be fully distributed or redeemed. This means that even if the credit coupons could be considered a value to the *class*, the settling parties have made it impossible for the settlement to comply with the Class Action Fairness Act—which dictates that "the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed." 28 U.S.C. 1712(a). These credit coupons will be distributed only if the defendant adjusts future shipping charges by another $10 million and future customers make $10 million of claims against the fund. The Dimensional Weight Compensation Fund appears not to be an actual endowment, but a contingent liability on defendant's balance sheet that can only be drawn on in the following particular circumstances: first, the defendant must adjust its post-agreement price upwards; second, the customer must undergo defendant's "enhanced claim process" and receive a counter-balancing "adjustment" (see SA, III.3.3) that is actually a "credit" (SA, III.2.3); third, the customer may (later on) redeem the "credit" during yet another purchase from defendant.

This "credit" appears to be a coupon of a special kind—a coupon that is only usable to recoup money already taken by a business practice that class counsel has already argued is

unacceptable. It is a coupon that is worth nothing and offers no net benefit to purchasers: the coupon merely offers restitution for the business practice which spawned this action and which the settlement contemplates leaving in place. The coupons that this settlement creates exemplify one of the most troubling aspects of coupon settlements: namely, they require consumers "to do future business with the defendant in order to receive compensation." *True v. American Honda Co.*, 749 F. Supp.2d, at 1069 (quoting *Figueroa v. Sharper Image Corp.*, 517 F.Supp.2d 1292, 1302 (S.D.Fla. 2007)). No class members will benefit at all from the Dimensional Weight Compensation Fund—period— with one incidental exception: that is, unless they do business *twice more* with UPS in the future. Then and only then, if the class member receives what the Settlement Agreement refers to as an "adjustment" upwards in price because of a future transaction with UPS, the class member will then be eligible to recoup those losses by receiving a coupon for UPS credit for a second future transaction with UPS.

### 2. The $10 Million Dimensional Weight Compensation Fund Cannot Benefit the Class.

The $10 million Dimensional Weight Compensation Fund, by definition, cannot benefit the class. The class is composed of people who have done business with UPS in the *past*; the Dimensional Weight Compensation Fund can only provide credit coupons to those who do business with UPS in the *future*. Because the fund, by definition, cannot compensate the class, it cannot be evaluated as part of the settlement: furthermore, it cannot be a basis for attorneys' fees or render the settlement fair, reasonable, and adequate. "The fairness of the settlement must be evaluated primarily based on how it compensates class members for these past injuries." *Synfuel Tech. DHL Indus., Inc.*, 463 F.3d 646, 654 (7th Cir. 2006). This is a case in which only the ($2 million in cash) Claims Made Class Fund can compensate class members; the ($10 million in credit coupons)

Dimensional Weight Compensation Fund cannot. One can imagine a settlement which required UPS to endow $10 million in educational scholarships or donations to food banks. Obviously, that would be a great benefit to society in general; just as obviously, it would not be a benefit to the class. It would therefore be inappropriate to include these charitable donations in any calculation of the fairness of the settlement to the class. The Heaser objectors are legitimately concerned that the essentially irrelevant inclusion of $10 million in credit coupons in this settlement may distract the attention of the class representative and the courts from their "duty to protect the interests of absent class members." *Silber,* 957 F.2d at 701. "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004). "There is no indirect benefit to the class from the defendant's giving the money to someone else." *Id.*   at 784. In short, the Dimensional Weight Compensation Fund is not designed to help the class, which by definition did business with UPS in the past: it is designed to compensate *future* customers in the event that UPS commits *future* torts.

### 3.   The Injunctive Relief Is Illusory For—Not Compensatory To—the Class.

The injunctive relief—like the $10 million in credit coupons supplied by the  Dimensional Weight Compensation Fund—also cannot compensate the class for past injuries. Its benefits to the class are illusory. To the extent that the injunctive relief has any value at all, prospective injunctive relief (again, by definition) cannot compensate class members for past harms. At best, these measures are only an agreement to end certain conduct in the future so as not to commit any more of the harms like those about which class members have complained. "No changes to future

advertising by [defendant] will benefit those who already were misled." *True v. American Honda Motor Co.,* 749 F. Supp.2d at 1077. "It is future customers who are not plaintiffs in this suit who will reap most of the benefit from these changes." *Synfuel,* 463 F. 3d at 654. The benefit of this injunctive relief to class members who have decided to do business with another shipper instead of UPS is exactly zero.

Notably, when courts have improved injunction-only settlements, those settlements contained material benefits that made class members whole. The injunctive relief proposed here does nothing of the kind. For example, in *Hanlon v. Chrysler Corp.,* the parties agreed to a settlement in which Chrysler would provide "a redesigned improved replacement latch to be installed free of charge." 150 F. 3d 1011, 1018 (9th Cir. 1998). The *Hanlon* class received relief, provided free of charge, that improved their lot: the new latch transformed each class member's defective vehicle into a repaired vehicle. But the prospective relief proposed here is completely different: this is a lawsuit over costs that class members say they never should have had to pay. Any future compensation to class members will not be provided "free of charge"—rather, it will only be supplied if and when class members do business with UPS once again (assuming that non-class future UPS customers have not already exhausted the fund). A class member will have to spend even more of his or her own money to receive any value from this forward-looking relief. If the settling parties in *Hanlon* had used this settlement's two-tier structure to address the injuries of the class, they would have produced an unwieldy settlement of far less value[6] to the class than a replacement latch: class

---

6 Note, however, that the Heasers do not object that this settlement conveys too little value to the class in any absolute sense, but rather that it gives too large a relative share to class counsel. The Heasers believe that the settling parties have failed to provide the information that would be necessary to make an informed judgment about the value of the settlement to any class member. See Section V below.

members would be entitled to claim a fractional refund that would likely not pay for a new latch, and some (but not all) non-class-member future purchasers would be entitled to receive more information about a potential credit on a future purchase upon their discovery of a product defect.

Furthermore, the new array of disclosures that this settlement contemplates would appear to be almost mandatory for any prudent company desiring to reduce its exposure to further litigation over its business practices. The parties have submitted no evidence as to the value of the injunctive relief included in the proposed settlement. Nor can they: this relief would be valuable only to class members who plan to continue doing business with UPS, and only to the extent that defendant does not raise its prices so as to fully reflect these new practices' cost. There is nothing in the settlement that suggests any kind of a ceiling on UPS's future pricing, and it is hard to believe that UPS will, as an economic matter, voluntarily give its customers something for nothing. UPS is certainly entitled to change its practices and its pricing whenever it wants, but there is no need for it to enlist a federal court and a nationwide class action in the process of doing it. And to repeat: to the extent class counsel has advocated the establishment of the injunctive relief and the Dimensional Weight Compensation Fund, it has overlooked the principle that any relief granted to a set of future consumers is inherently incapable of compensating for injuries suffered by its putative clients. *See, e.g, Synfuel,* 463 F.3d at 654. Under Rule 23(a)(4), class action attorneys represent a class, and they must put their clients' interest first. To the extent that class counsel acts as a private attorney general and attempts to restructure future economic transactions that affect only the interests of defendant and its future customers (who by definition are outside of the class) by directing resources to those third parties, class counsel has thereby betrayed its duty to its clients.

The objectors do not claim that injunctive relief is never appropriate in cases like this one: they simply argue that injunctive relief must benefit the class, as it did in *Hanlon*. Here, it does not. As such, it is essentially irrelevant and valueless to the class. The primary function of the injunctive relief, especially when combined with the $10 million of credit coupons in the Dimensional Weight Compensation Fund, appears to be an attempt to insulate the defendant from future liability—and, in particular, to require future customers who are faced with the recurrence of the "adjustments" that are the subject of this action to do business with defendant multiple times in order to recoup what they have lost.

**B.   This Settlement Contains Every One of *Bluetooth's* Three "Warning Signs" of Self-Dealing—And More.**

This settlement carries all of the indicia of self-dealing that caused a federal appellate court to strike down a similarly structured settlement less than three months ago. *Bluetooth,* 654 F.3d 935, 2011 U.S. App. LEXIS 17224. The Northern District of Alabama has previously spoken out against settlements that appear to be suspiciously self-dealing. *Whitson v. Heilig-Meyers Furniture,* CV 94-PT-0309-E, 1995 U.S. Dist. LEXIS 4312, at *23-26 (N.D. Ala. Feb. 9, 1995). The Ninth Circuit *Bluetooth* decision persuasively lists a non-exclusive set of indicia of self-dealing that attends to the concerns of *Whitson*. This court may not "create inter-circuit splits lightly." *Public Health Trust of Dade Cty., Fla. v. Lake Aircraft, Inc.,* 992 F.2d 291, 295 n.4 (11th Cir. 1993).

**1.   Under *Bluetooth,* Fairness Prohibits Self-Dealing.**

Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests … to infect the negotiations." *Bluetooth,* 2011 U.S. App. LEXIS 17224 at *28 (citing *Staton v. Boeing Co.,* 327 F.3d 938, 960 (9th Cir. 2003)). A "district court ha[s] a fiduciary responsibility to the silent class members."

*Grant v. Bethlehem Steel Corp.,* 823 F.2d 20, 23 (2d Cir. 1987). It is not enough that the settlement happened to be at "arm's length" without explicit collusion; the settlement must be objectively reasonable as well and avoid self-dealing by the class counsel.

The concerns about the potential conflict of interest between class counsel and their clients "warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement…" *Hanlon v. Chrysler Corp.,* 150 F.3d at 1021; *accord Bluetooth* 2011 U.S. App. LEXIS 17224 at *28.

Any court judging the fairness of a class action faces "a responsibility difficult to discharge when the judge confronts a phalanx of colluding counsel. The defendant wants to minimize outflow of expenditures and the class counsel wants to increase inflow of attorneys' fees. Both can achieve their goals if they collude to sacrifice the interests of the class." *Thorogood v. Sears Roebuck & Co.,* 547 F.3d 742, 745 (7th Cir. 2008), *vacated on other grounds by Thorogood v. Sears Roebuck & Co.,* -- S. Ct. --, 2011 U.S. LEXIS 4939 (2011).

That collusion need not be explicit: "The defendant, and therefore its counsel, is 'uninterested in what portion of the total payment will go to the class and what percentage will go to the class attorney.'" *Piambino II,* 757 F.2d at 1143-44 (quoting *Foster v. Boise-Cascade, Inc.,* 420 F.Supp. 674, 686 (S.D.Tex. 1976), *aff'd* 577 F.2d 335 (5th Cir. 1978)). It is therefore a mistake to conclude that when the prospect of express collusion is eliminated, the question is therefore answered: an impermissible self-dealing settlement can be achieved simply through the indifference of the settling parties to the interests of the class. Thus, courts judging the fairness of a settlement should not only ask whether a settlement was negotiated at arms' length, but whether the attorneys are unfairly pursuing their self-interest at the expense of the class. *Bluetooth,* 2011 U.S. App. LEXIS 17224  at

*28; *id.* at *31 ("While the Rule 23(a) adequacy of representation inquiry is designed to foreclose class certification in the face of 'actual fraud, overreaching or collusion,' the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations." (quoting *Staton*, 327 F.3d at 960)); *cf. also* American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.05, *comment b* at 208 (2010) ("a proposed settlement in which the class receives an insubstantial payment while the fees requested by counsel are substantial could raise fairness concerns").

### 2. The Settlement's Disproportionate Benefit to the Attorneys, Combined With Its Clear Sailing and Kicker Clauses, Are Indicators of Prohibited Self-Dealing.

The *Bluetooth* decision suggests a nonexclusive list of three possible signs of self-dealing. As in *Bluetooth*, all three of these "multiple indicia" of unfairness are present in this settlement. *Bluetooth*, 2011 U.S. App. LEXIS 17224 at *28–30.

First, "counsel receive[d] a disproportionate distribution of the settlement." *Id.* at *28 (quoting *Hanlon*, 150 F.3d at 1021). Class counsel requests $4 million for itself and $2 million for the class; class counsel has therefore managed to procure for itself two-thirds of the $6 million constructive common fund that class counsel has extracted from this settlement. As noted above, the "defendant, and therefore its counsel, is 'uninterested in what portion of the total payment will go to the class and what percentage will go to the class attorney.' " *Piambino II,* 757 F.2d at 1143. *See also GM Pick-Up*, 55 F.3d at 820 (3d Cir. 1995) (severable fee structure "is, for practical purposes, a constructive common fund"); *cf. id.* at 821 ("[P]rivate agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case."); *Johnson v. Comerica*, 83 F.3d 241 (8th Cir. 1996) ("[I]n essence the

entire settlement amount comes from the same source. The award to the class and the agreement on

attorney fees represent a package deal."). "If an agreement is reached on the amount of a settlement

fund and a separate amount for attorney fees" then "the sum of the two amounts ordinarily should

be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount

constituting the upper limit on the fees that can be awarded to counsel." Manual for Complex

Litigation § 21.71 (4th ed. 2008).  "Even if the plaintiff's attorney does not consciously or explicitly

bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has

indirect or subliminal effects on the negotiations." Report of the Third Circuit Task Force, Court

Awarded Attorney Fees, 108 F.R.D. 237, 266 (1985).[7]

Second, the settlement has a "clear sailing" arrangement that provides for the payment of

attorneys' fees separate and apart from class funds without challenge from the defendants. *Bluetooth*,

2011 U.S. App. LEXIS 17224  at *29. A clear sailing clause stipulates that attorney awards will not

be contested by opposing parties. "Such a clause by its very nature deprives the court of the

advantages of the adversary process." *Weinberger v. Great Northern Nekoosa Corp.,* 925 F. 2d 518, 525

---

[7] The fact that fees may not be negotiated until after the rest of the settlement should make
no difference. The settling parties are rational economic actors. Even when the negotiations over
fees are severed, the parties know in advance that those negotiations are coming, that the defendant
has already assigned a value to settling all aspects of the litigation, and that (as logically implied by
*Piambino II*'s holding referenced immediately above) every dollar negotiated for the class reduces the
amount the defendant is willing to pay class counsel. Because these future fee negotiations are not
an unexpected surprise, the overhang of the future fee negotiations necessarily infects the earlier
settlement negotiations. This is invariably at the expense of the class when there is a separate fund
for fees, because both class counsel and the defendants have an incentive to leave breathing room
for that future negotiation in a bifurcated negotiation that the parties do not need to have when it is
simply negotiating for a single pot of money to go into a common fund. *Cf. Bluetooth,* 2011 U.S. App.
LEXIS 17224  at *31 (neither presence of neutral mediator nor separation of fee negotiations from
other settlement negotiations demonstrates that a settlement is fair).

(1st Cir. 1991). The clause "suggests, strongly," that its associated fee request should go "under the microscope of judicial scrutiny." *Id.* The clear sailing clause lays the groundwork for lawyers to "urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *Id.* at 524; accord *Bluetooth,* 2011 U.S. App. LEXIS 17224 at *29. Here, class counsel put its own fees ahead of the interests of the class by negotiating a provision that insulates those fees from challenge by the defendant.

Third, the "parties arrange[d] for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* at *29. A "kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger" that is "already suggested by a clear sailing provision." *Id.* at *34. "The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees." *Id.* at *35. Unless this Court decides that "a kicker provision is in the class's best interest as part of the settlement package, the kicker makes it less likely that the settlement can be approved if the district court determines the clear sailing provision authorizes unreasonably high attorneys' fees." *Id.* (Sometimes courts go farther than *Bluetooth*, even holding that "the reverter clause and clear sailing clause raise a presumption of unfairness." *Sylvester v. Cigna Corp.*, 369 F.Supp.2d 34, 47 (D. Me. 2005).)

In short, this is a fee-driven settlement with a structure that is demonstrably neither fair nor reasonable.

### 3.    The "Kicker" Clause Constitutes A Breach of Duty to the Class Which Requires Rejection of the Settlement.

The problem with the kicker clause is not only that it is a sign of self-dealing. In addition, a "kicker" will likely have the additional self-serving effect of protecting class counsel by deterring

scrutiny of the fee award. Both courts and potential objectors have less incentive to scrutinize a fee with a kicker attached to it, because the kicker combined with the clear sailing agreement means that any reversion will only go to the defendant that has already agreed to pay that amount. Charles Silver, *Due Process and the Lodestar Method*, 74 TULANE L. REV. 1809, 1839 (2000) (such a fee arrangement is "a strategic effort to insulate a fee award from attack").

"Given the questionable features of the fee provision here, the court was required to examine the negotiation process with even greater scrutiny than is ordinarily demanded, and approval of the settlement had to be supported by a clear explanation of why the disproportionate fee is justified and does not betray the class's interests." *Bluetooth,* 2011 U.S. App. LEXIS 17224 at *36. If this court focuses solely, and wrongly, on the narrow question of explicit collusion without considering the problem of self-dealing and defendant indifference, it will ignore the spectre of self-dealing that hovers over this settlement.

The *Bluetooth* warning signs create a special obligation for the district court "to assure itself that the fees awarded in the agreement were not unreasonably high … for if they were, 'the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have been obtained.' " *Id.* at *30 (quoting *Staton*, 327 F.3d at 964, 965). Should this court fail to account for the unfairness of the settlement that the oversized attorneys' fee award demonstrates, it will overlook what should be at the center of its inquiry. *Cf. Bluetooth,* 2011 U.S. App. LEXIS 17224 at *32–33 ("[i]t is the settlement *taken as a whole, rather than the individual component parts,* that must be examined for overall fairness. … The settlement must stand or fall *in its entirety.*" (emphasis in original, quotations and citations omitted)).

18

Should the court decide that the requested fees are too high, the "kicker" will simply shift the remainder back into the pockets of the defendants. This is wrong. "If the defendant is willing to pay a certain sum in attorneys' fees as part of the settlement package, but the full fee award would be unreasonable, there is **no apparent reason** the class should not benefit from the excess allotted for fees." *Id.* at *34–35 (emphasis added). The reversion of an oversized fee request to the defendant is *per se* self-dealing that makes the settlement inherently unfair under Rule 23(e).

Moreover, if "class counsel agreed to accept excessive fees and costs to the detriment of class plaintiffs, then class counsel breached their fiduciary duty to the class." *Lobatz v. U.S. West Cellular of Cal., Inc.,* 222 F.3d 1142, 1147 (9th Cir. 2000). When class counsel bring class litigation to benefit themselves, rather than their putative class clients, they cannot meet the adequacy requirements of Rule 23(a)(4), and the class should not be certified. *In re Aqua Dots Prods. Liab. Litig.,* 654 F.3d 748 (7th Cir. 2011).

### 4.   The Settlement Also Contains Other Signs of Self-Dealing.

As noted above, courts "must be particularly vigilant not only for explicit collusion," but also for "warning signs" that "class counsel have allowed pursuit of their own self-interests … to infect the negotiations." *Bluetooth,* 2011 U.S. App. LEXIS 17224  at *28-29. *Bluetooth* lists "a few such signs"—disproportionate attorneys' fees, the "clear sailing" clause, a reversionary kicker of unawarded fees to defendants (*id.* at *29-30)—but does not purport to provide a complete list of the warning signs that suggest self-dealing. The settlement at hand, however, piles on even more indicia of self-dealing; that is, in addition to the three aspects of the settlement discussed above that suggest self-dealing, there are also others that seem to exist for "no apparent reason" (*cf. id.* at *35) except to benefit the settling parties or to make the work of objectors more difficult.

Perhaps the most notable (and, as compared to a typical class action settlement agreement, unusual) indicator of self-dealing here is the requirement that any objector who wishes to object to this settlement must either personally appear at the fairness hearing or hire an attorney to do so. SA, III.11.5. This is a highly burdensome requirement in a nationwide class with objectors who do not reside in or near Birmingham, Alabama. (The Heaser objectors live nearly a thousand miles away.) This provision appears to exist for "no apparent reason," except to dissuade, harass, and burden objectors; requiring objectors to appear in court to present an objection, or requiring them to hire a lawyer to do so, is unusual and unjustifiable.

Another indicant of self-dealing is the unusual paperwork burden that this settlement places on objectors. The Heaser objectors cannot complain when they are asked to submit written objections to class counsel, to defendants, to the court, or to the settlement administrator. But the Settlement Notice requires objectors to submit their objections to eight different places. Settlement Notice, § 15. The Settlement Agreement only required the signatures of two attorneys (SA, III.21.11), but the objectors are required to send paperwork to six of them, as well as to the Court and to the settlement administrator. Again, this provision appears to exist for "no apparent reason," except to dissuade, harass, and burden objectors. And because the settlement requires those objections to arrive by the November 7 deadline, not simply that they be postmarked on a date certain, the use of express mail will be necessary for many; with respect to the required eight copies, a reasonable estimate for the costs of shipping alone is north of $250. The Settlement Agreement will fully reimburse class counsel for the expenses they bear (SA, IV.5); the requirement that

objectors bear the costs for communications that should be taking place between multiple agents of class counsel seems to, once again, exist for "no apparent reason."[8]

Fed. Civ. R. Proc. 23(e)(5) says that "Any class member may object" to a settlement. Notably, the Rule does not require a personal appearance by the objector; nor does it require the objector to be represented by counsel; nor does it require the objector to provide anything beyond what is normally required by conventional notice obligations. It is difficult to see any justification for the highly unusual, and perhaps unique, burdens that this settlement places on those who wish to

---

[8] There appear to be at least two other toothless requirements in the Settlement Agreement that appear to have no rational justification and serve no apparent purpose other than to make the process of objecting more difficult.

*First*, there is the statement in the Class Notice that objectors will have to provide "Information about other objections you or your lawyer have made in other class action cases." In fact, the Settlement Agreement appears to provide no requirement for objectors to provide any such information, and only contains a requirement for objectors' attorneys to do so under certain circumstances. Class counsel is of course free to create dossiers on objectors and their attorneys based on public records created in the course of litigation, but any requirement that the objectors do class counsel's homework for them would appear to exist for the purpose of burdening the right of objection.

*Second*, the Class Notice's requirement that any "objection must include the dates when the objecting Settlement Class member is available for deposition" is objectionable. SA, § III.11.4. The court's August 29 Order makes no such demand that objectors supply such a schedule, and there is once again "no apparent reason" for the settling parties to require it. The declarations of the objectors that are attached to this objection contain all information that the settling parties could reasonably ask for, because the only reasonable concern of the settling parties about the objectors is whether they are legitimate members of the class who may legitimately object. A deposition of the Heasers would produce no information about the fairness of the settlement, and thus could only be intended to harass legitimate objectors and unreasonably make work for attorneys. If necessary, the Heasers will set aside time for deposition on November 17, 2011, but they do not anticipate that any deposition will be necessary absent a court order.

In short, both of the toothless demands in the Notice also appear to exist for "no apparent reason" except to dissuade, harass, and burden objectors.

exercise their right to object.  In fact, this brief's repetition that there is "no apparent reason" to burden objectors in this way should not obscure what is almost certainly the actual reason the settling parties have invented these burdens and placed them upon objectors: namely, to insulate an unfair and self-dealing settlement from criticism, and to dampen or extinguish the scrutiny that objectors ordinarily and conventionally provide through the process of the fairness hearing.[9] The adversarial perspective that objectors bring to the evaluation of a settlement's fairness will sometimes "significantly refine[ ] the issues" and improve the process. *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 359 (N.D.Ga. 1993). But the settling parties' conditions are apparently an attempt to burden and denigrate the right to object by transforming and shrinking it into something more like a privilege—one that can only be enjoyed by those with the time to travel or the resources to retain an attorney.

According to the Federal Judicial Center, "[s]ome settlement terms—'hot button indicators'—show their potential unfairness on their face." See Barbara J. Rothstein and Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges* § III.C. (2005). The Federal Judicial Center's report, which seems to anticipate a holding like *Bluetooth*'s, includes many elements of this settlement agreement—such as coupons, a clear sailing clause, and a "kicker"—in its dishonor roll of "hot button indicators" of potential unfairness. Because the *Pocket Guide* also warns judges not to "expect class representatives or other class members to attend the fairness hearing," it seems that

---

[9] Furthermore, there is a reasonable argument that the settling parties have maneuvered themselves and the Court into a too-clever-by-half consequence that, presumably, none of them desired: namely, by placing these unusual burdens upon objectors, the architects of this settlement have eliminated this settlement's power to bind those who do not participate in it. Class members who have been dissuaded from appearing at the fairness hearing by the settlement agreement's onerous burdens arguably cannot be bound by the hearing's results.

mandating the personal appearance of every objector in court as a condition of settlement objection should also earn a place on the list of suspect practices in *Managing Class Action Litigation*'s second edition. In short, there is "no apparent reason" why objectors to this settlement, or their counsel, should bear any special burden or constitute an exception to the *Pocket Guide*'s rule.

## IV.   Intra-Class Conflicts Preclude the Certification of a Single Settlement Class.

If this Court finds that the $10 million Dimensional Weight Compensation Fund is not illusory, then that implies a separate and independent fatal flaw of the settlement: inherent intra-class conflicts which require separate representation.

As noted above, the design of this settlement splits UPS customers whose shipping rates were adjusted into three separate categories: those who did business with UPS in the past and are thereby entitled to a fraction of cash from a $2 million fund, those who will do business with UPS in the future and are perhaps thereby entitled to credit coupons from a $10 million fund, and those who do business with UPS now (and in the immediate past and future[10]) and are thereby entitled to nothing.

As discussed above, however, the only parties in the class are the past purchasers. This settlement was gerrymandered so that different "subclasses"[11] would receive different kinds of compensation, despite the fact that their injuries were essentially identical. The "subclasses" at issue

---

[10] More precisely, this third class is composed of people who did business with UPS after August 29, 2011 and before the Effective Date. This is discussed in more detail in Section III.A. above.

[11] "Subclass" is used loosely here. Formal subclasses would require separate counsel. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) ("[I]t is obvious after Amchem that a class divided between holders of present and future claims (some of the latter involving no physical injury and to claimants not yet born) requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel.").

here are (a) those class members who intend to do continuing business with UPS and (b) those who do not. Both subclasses are competing over the total amount of relief available. This is precisely the problem that the Supreme Court addressed in *Amchem Products, Inc. v. Windsor,* 521 U.S. 591 (1997), when it found a similarly-structured settlement to be untenable. There is no reason to believe that the claims of the subclass who receive compensation from the $10 million fund are legally stronger than the claims of the subclass who receive only past compensation from the $2 million fund. A settlement that treats class members with identical claims in a disparate manner is inherently indefensible and cannot be certified. *In re Joint Eastern and Southern Dist. Asbestos Litig.,* 982 F.2d 721, 741-43 (2d Cir. 1992) (decertifying class under Rule 23(a)(4) because of conflicts of interest between different segments of class), *modified on reh'g on other grounds sub nom. In re Findley,* 993 F.2d 7 (2d Cir. 1993); *Mirfahisi*, 356 F.3d at 786. The settlement treats identically-situated class members differently—and only because some remain customers of UPS and others do not—thus, "the interests of those within the single class are not aligned." *Amchem Products, Inc.,* 521 U.S. at 626. The settlement contains "no structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Id. at* 627. This settlement would force class members who do not want to do business with UPS in the future into an inherent conflict of interest with the rest of the class, such that both groups would need separate representation to protect their interests: Rule 23(a)(4) requires separate representation for those class members who have no use for a future compensation fund, so that money is not siphoned from the past fund to the future fund. *See In re Literary Works in Elec. Databases Copyright Litig. v. Thomson Corp.*, 654 F.3d 242, 2011 U.S. App. LEXIS 17026, at *22-25 (2d. Cir. 2011). The class counsel and the class representative have simply failed to carry out their duty of ensuring that class members are treated equitably. In short, the presence of a

separate $10 million fund in this settlement only of use to some class members and not to others precludes class certification.

## V.        The Notice Is Insufficiently Informative.

Notice to the class "must contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment." *In re Domestic Air Transp. Antitrust Litig.,* 141 F.R.D. 534, 553 (N.D. Ga. 1992). In particular, the notice should "provide information that will enable class members to calculate or at least estimate their individual recoveries, including estimates of the size of the class and any subclasses." Manual for Complex Litigation § 21.312 (4th ed. 2004).

But this settlement never provides class members with anything like the information they need to estimate its value. All that the class members know is that they may claim a fraction of a $2 million fund. There is no way for class members to discern the number of potential claimants or the magnitude of potential claims, despite the fact that the settlement's architects almost certainly had access to those figures (and presumably relied on them during settlement negotiations). At a minimum, the notice should have contained the maximum possible amount of claims; ideally, that notice would also contain something in the way of a reasonable estimate of the sum of the claims' likely magnitude.

Some very satisfactory settlements compensate class members for nearly all of their losses. Other settlements, not nearly as satisfactory, are struck down because they seem designed to pay off class members with only a penny or two on the dollar. *See, e.g., Murray v. GMAC Mortgage Corp.,* 434 F.3d 948, 952 (7th Cir. 2006). The Heasers can have no position on whether this settlement is more

like the first kind or the second; the settlement notice is so deficient on this question that the Heasers are without the information they need to make an informed judgment.[12]

## VI.    This Court Could Strengthen Eleventh Circuit Law by Incorporating ALI Standards.

Standards for reviewing settlements differ from circuit to circuit: the "current case law on the criteria for evaluating settlements is in disarray." *ALI Principles* § 3.05, *comment a* at 205. Courts in the Eleventh Circuit generally begin their analysis with a six-factor test. *See, e.g.*, *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) ("(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved."). However, courts in this Circuit will abuse their discretion if they approve a settlement by examining only those six factors without looking beyond them. *Leverso v. Southtrust Bank*, 18 F.3d 1527, 1530-31 (11th Cir. 1994) (concluding that the district court abused its discretion despite "thoroughly address[ing]" all six factors and "rul[ing]" that each weighed in favor of approval").

Some of the *Bennett* factors are not helpful in evaluating a settlement, not least because the cases give no guidance to how to weigh the various factors. One way to resolve this concern and rationalize this Circuit's case law in this area would take the guidance of § 3.05 of the American Law Institute's *Principles of the Law of Aggregate Litigation* into account. The ALI *Principles* provide more than an indeterminate balancing test of multiple factors; rather, they suggest that courts should examine

---

12 Moreover, the claims period ends well after the opt-out and objection deadlines, which further obscures the settlement's true value and thus frustrates class members' deliberations.

settlements to see if they pass several specific tests of fairness. Under § 3.05(a), there is an initial

four-part test that all settlements must meet. Namely, the court must consider whether

> (1) the class representatives and class counsel have been and currently are
> adequately representing the class;
>
> (2) the relief offered to the class… is fair and reasonable given the costs,
> risks, probability of success, and delays of trial and appeal;
>
> (3) class members are treated equitably (relative to each other) based on their
> facts and circumstances and are not disadvantaged by the settlement
> considered as a whole; and
>
> (4) the settlement was negotiated at arm's length and was not the product of
> collusion.

In addition to these four requirements, a "settlement may also be found to be unfair for any

other significant reason that may arise from the facts and circumstances of the particular case." *Id.* §

3.05(b).

Notably, §§ 3.05(a)(1), 3.05(a)(2), and 3.05(b) all seem to invite the court to find a settlement

unfair when enough of *Bluetooth's* "warning signs" of self-dealing are enmeshed in it. Furthermore, in

order to follow the rule of *Leverso,* attention to something beyond the six *Bennett* factors is necessary:

otherwise, there is no way to account for *Leverso's* ultimate result, that the settlement there was unfit

for approval. *Leverso,* 18 F.3d at 1530-31. The *ALI Principles,* especially § 3.05(a)(3), work well to

explain and justify *Leverso's* otherwise puzzling holding. As such, it is clearly within this court's

discretion to use the § 3.05 standards as a consistent complement to the *Bennett* six-factor test.

Eleventh Circuit precedent on the question is compatible with the use of ALI's *Principles* § 3.05 in

evaluating this settlement; furthermore, appropriate use of the *Principles* would supply appropriate

grounding for the somewhat untethered *Bennett* factors, thus solving the problem of a multi-factor

27

test that provides little guidance in distinguishing good settlements from bad ones. (*Cf.* the discussion of judicial fee-setting in *Nilsen v. York County,* 400 F.Supp.2d 266, 277 (D. Me. 2005) (a multi-factor approach "offers little predictability" to lawyers and judges, and its "highly subjective approach" "allows uncabined discretion").)

Finally, the peculiar nature of this settlement agreement, in which objectors may not communicate with the court unless that communication is accompanied with a personal appearance or the appearance of counsel, underscores that at least one of the Eleventh Circuit's six *Bennett* factors is problematic: that is, the factor of "the substance and amount of opposition to the settlement." 737 F.2d at 986.  Surely this Court is not so much concerned with the *number* or *amount* of objections as it is with their *quality and value,* as measured by the ability of those objections to aid in the evaluation and improvement of this settlement.

In practice, any given class action settlement, even absent this settlement's requirements of personal appearance or the appearance of counsel, will produce only a small percentage of objectors. The predominating response to any settlement will always be apathy, because objectors—unless they can obtain *pro bono* counsel—must expend significant resources on an enterprise that will create little direct benefit for themselves. Another common response from non-lawyers will be the affirmative avoidance, whenever possible, of anything involving a courtroom. Class counsel may argue that this understandable tendency to ignore notices or free-ride on the work of other objectors is best understood as acquiescence in or evidence of support for the settlement. This is wrong. Silence is simply *not* consent. *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 447 (S.D. Iowa 2001) (*citing In re Gen. Motors Pick-Up Litig.,* 55 F.3d at 789.). "Silence may be a function of ignorance about the settlement terms or may reflect an insufficient amount of time to object. But most likely, silence is a

rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low." Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 73 (2007).

There is usually little hope that opt-outs can recover for their claims—the entire purpose of class actions is to aggregate claims that would be uneconomical to bring individually. "Almost by definition, most class members have too little at stake to warrant opting out of the class litigation and filing an individual lawsuit. Thus, opting out is probably not a viable option even though a proposed settlement is unfair or inadequate." *Id.* at 109. Without *pro bono* counsel to look out for the interests of the class, filing an objection is economically irrational for any individual. "[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *In re Gen. Motors Pick-Up Litig.*, 55 F.3d at 812 (*citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217-18 (5th Cir. 1981)); *cf. Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292, 297 (M.D. Pa. 1995) ("'[T]he silence of the overwhelming majority does not necessarily indicate that the class as a whole supports the proposed settlement . . . . '"). "[A] low number of objectors is almost guaranteed by an opt-out regime, especially one in which the putative class members receive notice of the action and notice of the settlement offer simultaneously." *Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439, 446 (W.D. Pa. 2007). "[W]here notice of the class action is, again as in this case, sent simultaneously with the notice of the settlement itself, the class members are presented with what looks like a *fait accompli*." *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677, 680-681 (7th Cir. 1987). "Acquiescence to a bad deal is something

29

quite different than affirmative support." *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1137 (7th Cir. 1979) (reversing approval of settlement).

In the cases in which the amount of compensation that class members might receive is essentially a mystery—as in this case, in which claimants are without any realistic estimate of how much their share of the Claims Made Class Fund will be prorated downward—the rate of response will be dampened even more. As such, the response from class members cannot be seen as something akin to an election or a public opinion poll. *See In re Gen. Motors Pick-Up Litig.*, 55 F.3d at 813 (finding that "class reaction factor" does not weigh in favor of approval, even when low number of objectors in large class, when "those who did object did so quite vociferously"); Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 VAND. L. REV. 1529, 1532 (2004). It is typically not worth the average citizen's time or money to object: the slight likelihood that one additional objection will be decisive, when multiplied by the slight increase in an individual class member's payout that such an objection would produce, makes individually-funded objections a losing proposition.

The Court must act as a guardian for *all* class members—whether or not they have formally entered the case by registering an objection. "[T]he absence or silence of class parties does not relieve the judge of his duty and, in fact, adds to his responsibility." *Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.*, 52 F.R.D. 373, 375 (D. Kan. 1971). The Court should draw no inference in favor of the settlement from the number of objections, especially given the vociferousness of the objectors. *In re Gen. Motors Pick-Up Litig.*, 55 F.3d at 812-13; *ALI Principles* § 3.05, comment *a* at 206.

**VII.    If the Court Approves This Settlement, It Nonetheless Cannot Approve the Fee Request.**

**A.    The Notice Violates Rule 23(h).**

Under the plain language of Fed. R. Civ. Proc 23(h), class counsel is required to submit its basis for attorneys' fees well before objections are due, so that the class has a full and fair opportunity to address the claims made. *In re Mercury Interactive Corp. Sec. Lit.*, 618 F.3d 988 (9th Cir. 2010). Objections must be received by November 7, 2011, but the legal basis and evidence for the settlement and fee request has not yet been filed. As a matter of law, this is insufficient notice in violation of Rule 23(h). "The plain text of the rule requires a district court to set the deadline for objections to counsel's fee request on a date after the motion and documents supporting it have been filed." *Id.* at 993. Class members have been "deprived of an adequate opportunity to object to the motion." *Id.* As such, new notice would be required under Rule 23(h).

**B.    The Fee Request Should Not Consume Two-Thirds of the Class's Recovery.**

As discussed in some detail in Section III.B.2 above, class counsel's request of $4 million for itself and $2 million for the class results in the class attorneys procuring two-thirds of the constructive common fund for themselves. (The credit coupons from the Dimensional Weight Compensation Fund will not compensate the class, and so by definition those coupons therefore may not be counted as a class benefit. To the extent that the settling parties have relied on the credit coupons from the Dimensional Weight Compensation Fund to determine the size of attorneys' fees, those fees are also impermissible for another reason: the Class Action Fairness Act disallows the use of unredeemed coupons for the purpose of attorney fee calculation, because "the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on *the value to class members* of the coupons that are redeemed." 28 U.S.C. § 1712(a) (emphasis added).)

31

The two-thirds figure is, of course, double the stereotypical amount that plaintiffs' lawyers receive as fees when representing *individuals*, not classes, and it is far outside the neighborhood of the 25% benchmark that is at the center of attorney fee calculations in common-fund class actions in this Circuit and in others.[13] "When the class attorneys succeed in reaping 'a golden harvest of fees' in a case involving a relatively small recovery, the judicial system and the legal profession are disparaged." *Piambino II,* 757 F.2d at 1144 (citation omitted).

When calculating attorney fees, the law of this Circuit requires the use of the percentage-of-recovery method. *See, e.g., Camden I Condominium Ass'n v. Dunkle,* 946 F.2d 768 (11th Cir. 1991) (abuse of discretion to use lodestar rather than percentage-of-recovery method of awarding fees, but lodestar is still permissible in fee-shifting statute cases). This Circuit has adopted the 25% benchmark prevalent in much of the nation: "district courts are beginning to view the median of this 20% to 30% range, i.e., 25%, as a 'bench mark' percentage fee award which may be adjusted in accordance with the individual circumstances of each case, as opposed to the lodestar hourly fee used in statutory fee awards." *Id.* at 775. See also *Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291, 1294 (11th Cir. 1999). The court may adjust the benchmark upward or downward (although it

---

[13] The 25% benchmark is routinely and expressly relied upon in this Circuit and others. With respect to the latter, *see, e.g., Torrisi v. Tucson Elec. Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) (in common fund cases, "we have established 25% of the common fund as the 'benchmark' award for attorney fees."). *See also, e.g., Bluetooth* at *14; *Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir. 1990). The D.C. Circuit uses a 20% to 30% range  in common fund cases; this approach originated with *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1272 (D.C. Cir. 1993). Cases following *Swedish Hospital's* approach include *FreshKist Produce, L.L.C. v. Choi Corp.,* 362 F.Supp.2d 118 (D.D.C. 2005); *FreeportPartners, L.L.C. v. Allbritton,* No. 04-cv-2030, 2006 WL 627140, at *5 (D.D.C. Mar. 13, 2006). *Cf. Gottlieb v. Barry,* 43 F. 3d 474, 487 (10th Cir. 1994) (22.5% "well within the range of permissible reasonable fee awards").

cannot go as far up as a two-thirds share),[14] but it "should articulate specific reasons for selecting the percentage upon which the attorneys' fee award is based. The district court's reasoning should identify all factors upon which it relied and explain how each factor affected its selection of the percentage of the fund awarded as fees." *Camden I Condominium Ass'n,* 946 F.2d at 775. A fee award anywhere near the territory where class counsel has planted its flag will therefore leave the court with a good deal of explaining to do: the court must make specific note of its valuations and the method it employs in allotting fees. See *Burke v. Wis. Inv. Bd.,* 317 F.3d 1261, 1263 (11th Cir. 2003) (per curiam) (vacating order allocating fees in class action suit because "[n]o finding of fact or rationale is provided in the order to aid our understanding of the allocations made").

Regrettably, even if this Court reduces the requested attorneys' fees, the bargain made by the settling parties blocks judicial fee-trimming from doing anything for the class: as discussed above in Section III.B.2, this settlement's "kicker" provision will put the remainder from the reduced fee back in the pockets of the defendant.

## VIII.   This Objection Is Brought In Good Faith.

The Heasers' counsel, the Center for Class Action Fairness LLC ("the Center"), is a non-profit program founded in 2009. The attorneys engaged by the Center represent consumers *pro bono*

---

[14] The 12 factors from *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974) are "(1) the time and labor required; "(2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases." But no matter how much play these factors are given, the rule is that two-thirds of the common fund is far above the permitted "upper limit." See *Camden I Condominium Ass'n,* 946 F.2d at 774-75.

by, among other things, representing class members aggrieved by class action attorneys that negotiate settlements that benefit themselves at the expense of their putative clients. The Center has won millions of dollars for class members since its founding in 2009. *See, e.g.,* Ashby Jones, *A Litigator Fights Class-Action Suits,* Wall St. J. (Oct. 31, 2011); Rachel M. Zahorsky, "Unsettling Advocate," ABA J. (Apr. 2010); Allison Frankel, "Legal Activist Ted Frank Cries Conflict of Interest, Forces O'Melveny and Grant & Eisenhofer to Modify Apple Securities Class Action Deal," AMERICAN LAWYER LIT. DAILY (Nov. 30, 2010).

It is perhaps relevant to distinguish the Center's mission from the agenda of those who are often styled "professional objectors." It is understood that "professional objectors" are for-profit attorneys who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees; thus, some courts presume that the objector's legal arguments are not made in good faith. Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403, 437 n. 150 (defining "professional objector" to exclude non-profit public-interest litigators). This is not the business model of the Center for Class Action Fairness, which is funded entirely by charitable donations and court-awarded attorneys' fees.[15] *See* Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to*

---

[15] The Center does not request the award of attorneys' fees by the court unless its objection materially improves a settlement so as to benefit the class. This Court's Order of August 29, 2011, §16, requires any attorney who "intends to seek fees and expenses" from the court to file a document containing several categories of information that are relevant to a fee request. Because the Heasers' attorneys do not currently intend to seek fees and expenses, and indeed will have no such intent without some action from this Court or the settling parties that materially improves this settlement so as to benefit the class, the Heasers' attorneys have at the present time filed no document relating to attorneys' fees. Should the settlement be modified to be non-objectionable, the Heasers will at that time evaluate whether they will request fees and submit required information should their intentions regarding fees change.

*Approval*, Bureau of National Affairs: Class Action Litigation Report, Aug. 12, 2011 (distinguishing the Center from professional objectors). While the Center focuses on bringing objections to unfair class action settlements, it refuses to engage in *quid pro quo* settlements and does not extort attorneys; the Center has never settled an objection.

Because the Center does not object indiscriminately, it has an excellent track record of success. In 27 cases to date where the Center has objected 28 times, courts have rejected the underlying settlement or materially modified the settlement and fee request thirteen times; on two other occasions, parties responded to the Center's objection before the fairness hearing by modifying settlements so as to provide millions of dollars more cash to the class. The Center has lost three objections with finality and has fifteen objections pending in trial or appellate courts (including five where the objection was upheld in part). In short, the Heasers bring this objection in good faith to protect the interests of the class. Nonetheless, it is the experience of the Center, based on the conduct of class counsel in other cases, that some attorneys will falsely and unjustifiably accuse the Center of seeking to extort class counsel. If this Court has any doubt whether the Center's objection is brought in good faith, the Heasers and the Center are willing to stipulate to an injunction prohibiting them from accepting a cash payment in exchange for the settlement of this objection.

## CONCLUSION

This proposed settlement treats all parties involved satisfactorily, with the exception of the class in whose name it is brought. Regrettably, the lion's share of this settlement will be devoured by attorneys' fees, and another portion that should go to class members will instead go to third parties. The notice that class members receive is not so much deficient as it is empty of the information

necessary for any class member to evaluate the settlement. The "clear sailing" and "kicker" provisions that the settlement contains, like the two-thirds share of compensation to class counsel, appear to be warning signs of self-dealing which signal a less than zealous attention to the interests of the class—which, to state the obvious, are the interests which should drive the settlement. This is a settlement which is generous to its advocates, but that generosity cannot be reconciled with class counsel's duty under Rule 23(a)(4) to "fairly and adequately protect the interests of the class." Class counsel has neglected its fiduciary responsibilities in its advocacy of this settlement agreement, and this Court should carry out its own fiduciary responsibilities in rejecting it.

In the event that this Court approves the settlement, it should reduce the fees that class counsel requests to one-quarter of the settlement's benefit to the class. The class benefit appears to be $2 million, and class counsel's currently requested fee of $4 million for getting the class a benefit of half that size is not so much excessive as it is exorbitant.

Dated:  November 4, 2011

Respectfully submitted,

*/s/ Daniel Greenberg*
Daniel Greenberg
Arkansas Bar # 2007-193
CENTER FOR CLASS ACTION FAIRNESS LLC
GREENBERG LEGAL SERVICES
55 Fontenay Circle
Little Rock, AR  72223
Telephone:  (501) 588-4245
Email:  dngrnbrg@gmail.com
(*pro hac vice* pending)

*/s/ John J. Park, Jr.*
John J. Park, Jr.
Bar # ASB-8382-P62J
STRICKLAND BROCKINGTON LEWIS LLP
1170 Peachtree Street NE, Suite 2200
Atlanta, GA 30309
Telephone:  (678) 347-2208
Fax: (678) 347-2210
Email:  jjp@sbllaw.net

Attorneys for Objectors
Brandy Heaser and Noah Heaser

**PROOF OF SERVICE**

I hereby certify that on November 4, 2011, I sent this objection to all eight of the parties listed below by express mail, in order to follow the instructions of the Court-authorized Settlement Notice.

Clerk of the Court
U.S. District Court for the Northern District
of Alabama
Hugo L. Black U.S. Courthouse
1729 Fifth Avenue North
Birmingham, AL 35203

Paul J. Murphy
KING & SPALDING LLP
1180 Peachtree Street
Atlanta, GA 30309

Harlan I. Prater
LIGHTFOOT, FRANKLIN & WHITE LLC
The Clark Building
400 North 20th Street

Nicholas B. Roth
EYSTER, KEY, TUBB, WEAVER & ROTH
402 East Moulton St. SE
P.O. BOX 1607
Decatur, AL 35602

UPS Dimensional Adjustments Settlement
Exclusion P.O. Box 2601
Faribault, MN 55021-9601

Dennis G. Pantazis
WIGGINS CHILDS QUINN & PANTAZIS
The Kress Building
301 19th Street,
North Birmingham, AL 35203- 3204

E. Clayton Lowe, Jr. Esq.
Peter A. Grammas, Esq.
LOWE & GRAMMAS, LLP
1952 Urban Center Parkway
Vestavia Hills, AL 35242

James M. Corder, Jr.
ALEXANDER,   CORDER,   PLUNK   &
SHELLY P.C.
Jefferson at Green
Athens, AL 35612

Executed on November 4, 2011.

/s/ Daniel Greenberg
Daniel Greenberg