

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BARBER AUTO SALES, INC.,** individually and on behalf of all persons similarly situated, | ) ) ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) ) | **CIVIL ACTION NO.:** **5:06-cv-04686-IPJ** |
| **UNITED PARCEL SERVICES, INC.,** | ) ) | |
| | ) | |
| **Defendant.** | ) | |

## MOTION TO CERTIFY FINAL SETTLEMENT CLASS, AND FOR AWARD OF FEES AND EXPENSES, AND <u>CLASS REPRESENTATIVE INCENTIVE AWARD</u>

Plaintiff in the above-referenced case moves this Court for Final Approval of the proposed settlement in the above-captioned class action,[1] for a $10,000.00 incentive award for class representative Baber Auto Sales, Inc., and for an award

---

[1]On August 19, 2011, the parties filed a Joint Motion for Preliminary Approval of Settlement. The class consists of all "contractual UPS customers between May 11, 2006, and August 29, 2011 [the date of the Order granting preliminary settlement], who shipped packages with UPS from one location in the United States to another location within the United States wherein the shipper entered into the UPS system, including, but not limited to, iShip and Worldwide Systems, the height, length, and width of the packages which UPS used to determine the dimensional weight, where UPS audited the packages and based upon those audits, entered new and larger dimensions from those entered by the customer." Settlement Agreement, Doc. 151, p. 12.

of fees and expenses to Class Counsel in the amount of four million dollars ($4,000,000.00).[2]  As grounds for this motion, Plaintiff states the following:

## I.  INTRODUCTION

As set forth in the Joint Motion for Preliminary Approval of Proposed Settlement, Doc. 152, the settlement of this action only came about after almost five years of contentious litigation.  The Complaint in this action was filed on November 15, 2006, Doc. 1, and amended on February 20, 2007.  Doc. 18.  The Amended Complaint alleges that UPS breached the "appropriate adjustment" provision of its uniform customer contract by "increasing the dimension sizes" when auditing packages that Barber shipped with UPS, thereby increasing Barber's shipping charges.  Doc. 18, p. 6.

UPS asserted in a Motion for Judgment on the Pleadings, Doc. 23, that Barber's claims for injunctive and declaratory relief were preempted under the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. §§ 14501(c)(1) and 41713(b)(4)(a) (hereinafter "FAAA").  The Motion also sought to dismiss claims that arose more than eighteen months before the filing of the Complaint under the FAAAA statute of limitations, and any claim for which Barber or a class member did not provide notice to UPS within 180 days of a disputed invoice under a contractual notice provision and 49 U.S.C. §

_____
[2]The total request of $4M includes reimbursement of expenses of $104,631.71.  If approved, the fee is $3,895,368.299.

13710(a)(3)(b).   On June 5, 2007, Doc. 34, the Court granted UPS's Motion regarding injunctive relief, and for claims beyond the above-referenced time limitations.

On September 24, 2007, Doc. 43, two parties with a pending RICO action against UPS in the Northern District of California filed a Petition to Intervene in this case.   Doc. 42.   That Motion was briefed by the parties, and decided by this Court on October 17, 2007, Doc. 63.     After Intervenor's Motion for Reconsideration was denied, Doc. 63, a Notice of Appeal on the issue was filed. Doc. 69.   The Eleventh Circuit eventually affirmed this Court's ruling.   At about this time, the parties began the process of discovery.   In response to document requests, UPS produced several hundred thousand pages of documents.   Grammas Decl., ¶ 3.   Class Counsel reviewed and analyzed all documents and records produced by UPS in this action and produced thousands documents in response to UPS's discovery request, Pantazis Aff., ¶ 9, Ex. A hereto; Grammas Decl., ¶3, Ex. B hereto.

The parties deposed numerous fact and expert witnesses, Pantazis Aff., ¶ 8. Plaintiff hired an expert, Pantazis Aff., ¶ 10, to examine and analyze millions of shipping and billing records provided by UPS, while UPS retained experts in weights and measures (Henry Opperman), and a forensic accounting expert (Chel Tangier), which were deposed by Plaintiff.

Plaintiff filed a Motion for Class Certification on June 12, 2009.  The matter was fully briefed, Docs. 115, 116, 119, 120, and 121, and, on September 2, 2009, a full hearing was held on the Motion for Class Certification.   On September 29, 2009, the Court entered an Order certifying the class in this case, Doc. 132.  That Order was accompanied by a Memorandum Opinion, Doc. 131, outlining, in particular, how Plaintiff had met its burden under Fed.R.Civ.P. 23(a)(1) - (4) and 23(b)(3).   That Order was amended to add additional findings concerning Fed.R.Civ.P. 23(a)(4) on October 2, 2009, Doc. 133, and then amended again to make clear that certain persons were excluded from the class.  Doc. 136.  On October 14, 2009, Doc. 137, Defendant filed a Motion to Reconsider the Court's September 29, 2009 Opinion as amended.   After briefing by the parties, on November 18, 2009, the Motion for Reconsideration was denied. Doc. 146.

On December 1, 2009, UPS filed a Petition, pursuant to Fed.R.Civ.P. 23(f), requesting Eleventh Circuit review of this Court's Order granting class certification.  The Motion was, of course, briefed by the parties and, on February 25, 2010, the Eleventh Circuit granted permission to appeal.  The appeal in this matter, in addition to the typical briefing involved, also drew *amicus* interest from the American Trucking Association, and the United States Chamber of Commerce. Argument was had before the Eleventh Circuit January 26, 2011.  UPS vigorously

denied both liability and that the action is subject to class certification.  Grammas Decl., ¶3.

As will be shown below, the parties attempted to mediate this case over a period of more than two years.  The first mediation effort was in the fall of 2008, and the second effort began shortly after argument before the Eleventh Circuit on the class certification issue in January, 2011.  Grammas Decl., ¶3.   The parties relied upon Rodney A. Max, one of the most accomplished mediators in the country, to mediate the dispute.  He has focused solely on mediation since 1992, specializing in class actions, mass torts, and complex and catastrophic damages cases, Max Decl., ¶ 9, Ex. C hereto.

In October of 2008, the parties first met in Atlanta, Georgia, for mediation. Max Decl., ¶ 2.  The mediation process in this case was long and contentious, and broke down completely in October of 2008, with the parties deciding to litigate the class action issues.  The mediation was discontinued because discussions were not productive, and the sides were entrenched.   Max Decl., ¶ 3.   In addition, the Eleventh Circuit required mediation prior to briefing on Defendant's interlocutory appeal.  These efforts also failed.  Grammas Decl., ¶ 4.

Following oral arguments before the Eleventh Circuit on UPS's appeal of the class certification Order, the parties contacted Mr. Max again to see if some resolution could be reached. Max Decl., ¶ 3.  A mediation session was held on

March 3, 2011, and continued with many meetings and phone conferences, during which the various issues were vigorously disputed.  Max Decl., ¶¶ 4, 5; Grammas Decl., ¶ 5.  An agreement as to the material terms of the settlement took months to come to, and many meetings and discussions occurred, both between the parties individually and collectively, Max Decl., ¶ 5.

It was not until after the substance of the Settlement Agreement was agreed to that the parties began negotiating attorneys' fees.  Impasse was reached with regard to attorneys' fees, and negotiations were on the verge of breaking off.  Max Decl., ¶ 6; Grammas Decl., ¶ 5.   On May 20, 2011, Mr. Max submitted a "mediator's proposal" on the fees issue.  This figure was a significant compromise for both parties from previously held positions, and if rejected, would have ended settlement efforts.  Grammas Decl., ¶ 5.  The proposal was ultimately accepted by both parties on June 1, 2011, Max Decl., ¶ 6.  At that point, the parties reduced to writing those agreements made during the mediation session, and eventually filed the Settlement Agreement with the Court, Doc. 151.

The substantive terms of the Settlement are that those making claims are to be paid, dollar for dollar, their total damages from two funds equaling $12M.[3]  The two funds are: (1) a cash settlement program (the "Cash Fund") in which class

---

[3]This obligation is, of course, bounded by the number of claims made in the Claims Made Class Fund ("Cash Fund"), to be reduced pro-rata upon exceeding the $2M fund limits, and upon exhaustion of the $10M Dimensional Weight Compensation Fund ("Compensation Fund").

members simply make a valid claim for the amounts of their shipping charge corrections ("SCCs"), and will be paid that amount; and (2) the Dimensional Weight Compensation Fund (the "Compensation Fund"), which provides prospective relief for those who receive SCCs incurred after the effective date of the settlement.[4]

In addition to the cash and credits, UPS has agreed to prospective relief regarding customer support, and an enhanced explanation of how customers may obtain adjustments for SCCs. While this relief certainly benefits the class, it is not used to support the fee request. The prospective relief is important in because it directly addresses the breach of contract claim relating to UPS's standard form contract. The contract states that UPS accepts packages, measured by its customers subject only to its right to subsequently "audit invoices to verify...package or shipment weight, and applicability of any charges, and to make appropriate adjustments." Plaintiff's claim is that the system UPS used was so subject to inaccuracy that any SCCs based thereon cannot be "appropriate" per the terms of the contract.

As a direct result of this action, UPS is now obligated to describe how the audit process will be used, including the use of Multiple Dimension Measuring Devices, to make adjustments, or SCCs. No longer will UPS's customers be left in

---

[4]Eighty-nine percent (89%) of the class members are current customers, and are eligible to take part in the prospective relief afforded under the Compensation Fund.

the dark as to the process for making SCCs, or how to dispute those charges.  In addition, UPS will explain to its customers how to properly measure packages to avoid common measurement problems.  The contract will clearly lay out that UPS will use the multiple dimensional measuring devices, and how that process may result in SCCs.  More importantly, the contracts will now clearly lay out UPS's right to audit customer input measurements, and in what cases SCCs may be assessed, allowing class members to make decisions as to their own measuring practices, and whether they even want to use UPS at all.

The litigation of this case took place over five (5) years, involving law firms on Plaintiff's side with a wealth of experience in litigating these types of document intensive, technical cases against able defense counsel.  The Wiggins, Childs, Quinn & Pantazis, LLC ("WCQP") law firm expended 2155.93 hours litigating this action, resulting in a lodestar of $1,136,239.75.  Pantazis Aff., ¶¶ 6,7; Wiggins Aff., Ex. D hereto, ¶¶ 3, 7, 9, 14, 15.[5]  Similarly, the law firm of Lowe & Grammas ("L&G") expended 2107.106 hours litigating this action, creating a lodestar at $450.00 per hour of $947,700.00.  In addition, attorneys including Nicholas Roth at the law firm of Eyster, Key, Tubb, Roth, Middleton & Adams, LLP expended 343.1 hours, creating a lodestar amount of $185,447.50, Roth Aff., ¶ 4, Ex. E

---

[5]The declarations of the attorneys attesting to the time spent on this matter are attached hereto. The time entries are filed *in camera* with the Court to preserve the attorney-client and attorney work product privileges.

hereto; James M. Corder and Mitchell K. Shelly of Alexander, Corder, Plunk, & Shelly, P.C. expended 854.50 and 428.25 hours respectively, creating a lodestar amount of $518,706.25, Corder, Shell Decl., ¶ 6, Ex. F hereto.  In total, counsel expended 5888.886 hours in this case for a lodestar amount of $2,788,803.70.  All of this time was necessary to prevail on the numerous motions filed in this case, and to adequately prepare the case in the face of vigorous opposition.  Grammas Decl., ¶ 9.  Moreover, all efforts were made to exclude redundant or unnecessary time entries.

## II.  ARGUMENT

### A.  <u>The Requirements of Fed.R.Civ.Pro. 23(a) Are Met.</u>

The requirements of Fed.R.Civ.P. 23 have been met here.  The Fed.R.Civ.P. 23(a) requirements are: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy.  In addition, Rule 23(b)(3)'s requirements of common question predominance and superiority have been met.  The arguments for certification are more thoroughly presented in Plaintiff's Memorandum in Support of Motion for Class Certification, Doc. 119, and this Court found them to be met in its Memorandum Opinion, Doc. 131.  These documents are incorporated herein, and the evidence regarding Rule 23's requirements are only stated in brief terms herein.

1.      **The Class Is Sufficiently Numerous.**

Rule 23(a)(1) only requires that the class be so numerous that joinder of all members is "impracticable."  Kleiner v. First National Bank of Atlanta, 97 F.R.D. 683 (D.C.Ga. 1983).  UPS has in excess of a million customers who input measurements of their packages and received SCCs during the class period, and they are geographically dispersed throughout the country, Okon Depo., p. 12.  The records concerning these customers and their SCCs are maintained by UPS in three databases used to identify class members and their SCCs, Snow Aff., ¶ 9, Coady Depo., p. 112.  The information contained in these three databases meets the requirement to show that "joinder is impracticable through 'some evidence or reasonable estimate of the number of purported class members.'"  Anderson v. Bank of the South, 118 F.R.D. 136, 145 (M.D.Fla. 1987).

2.      **Commonality.**

The Rule 23(a)(2) commonality requirement is "not high."  Morris v. Transouth Fin. Corp., 175 F.R.D. 694, 697 (M.D. Ala. 1997), and the standard is qualitative rather than quantitative.  Moreover, one common question may be sufficient to satisfy Rule 23(a)(2).  Larry James Oldsmobile-Pontiac-GMC Truck Co. v. General Motors Corp., 164 F.R.D. 428 (N.D. Miss. 1996); 1 Newberg on Class Actions 3d (1992) § 3.10.  As one court explained:

> A common question is one which arises from a "common nucleus of operative facts" regardless of whether "the underlying facts fluctuate over the class period and vary as to individual claimants." Cohen v. Uniroyal, Inc., 77 F.R.D. 685, 690-91 (E.D. Pa. 1977); In re Corrugated Container Antitrust Litigation, 80 F.R.D. 244, 250 (S.D. Tax. 1978). See also, Muth v. Dechert, Price & Rhoads, 70 F.R.D. 602, 607 (E.D. Pa. 1976) (common course of conduct yields common questions).

In re Asbestos School Litigation, 104 F.R.D. 422 (E.D. Pa. 1984), aff'd in relevant part and rev'd in part sub nom, 789 F.2d 996 (3d Cir. 1984), cert. denied, 479 U.S. 852 (1986).

The overriding common question in this case is whether the audit process UPS uses to assess SCCs breaches the standard form contract provision which only allows UPS to make "appropriate adjustments." UPS's contractual right to make only "appropriate adjustments" is exactly the same for "whatever customers they [UPS] are dealing with." Okon Depo., p. 53.[6] As such, the interpretation of this provision provides a common question that is appropriate for class treatment. Kleiner v. First Nat'l. Bank, 97 F.R.D. 683, 693 (N.D. Ga. 1983) ("[c]laims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such.").

---

[6] The deposition transcripts referenced herein were all filed with Plaintiff's Memorandum in Support of Motion for Class Certification. They are not re-filed herewith.

Mr. Okon testified on behalf of UPS that, "[a]ll the packages are measured according to one way."  Okon Depo., p. 146.  Mr. Okon stated, whether the case was brought individually, or as a class, he would rely upon the measurements of the device, the testing of the device, and if necessary invite the jury to observe packages as they are being measured."  Okon Depo., pp. 220-221.  It simply does not matter whether the case is brought individually, or as a class, in terms of what facts UPS would use to defend the case.  As such, the commonality requirement is met.

### 3. <u>Typicality</u>.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  There must be some nexus between the class representative's claims and the common questions of  law or facts which unite the class.  <u>Kornberg v. Carnival Cruise Lines, Inc.</u>, 741 F.2d 1332 (11th Cir. 1984).  A sufficient nexus is established if the claims of the class and the claims of the class representative arise from the same event or pattern and are based on the same legal theory.  <u>Id.</u> at 1337.  Typicality, much like the element of commonality, is established if the representative plaintiff's claims arise from the same practice or course of conduct and are based on the same legal theory as those of other class members.  <u>Warehouse Home Furnishing Dist., Inc. v.  Whitson</u>, 709 So.2d  1144,  1149  (Ala.  1997)("Typicality  exists  when  a  plaintiff/class

representative's injury arises from or is directly related to a wrong to a class and that wrong to the class includes the wrong to the plaintiff."); Andrews v. American Tel. & Tel. Co., 95 F.3d 1014 (11th Cir. 1996); Appleyard v. Wallace, 754 F.2d 955 (11th Cir. 1985); Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332 (11th Cir. 1984).

As one commentator concluded:

> When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met **irrespective of varying fact patterns which underlie individual claims.**

Newberg on Class Actions 3rd § 3.13, pp. 3-77 (emphasis added).  UPS's common custom and practice of making "inappropriate adjustments" to its customers' invoices was directed at Barber Auto and every other UPS customer who entered the dimensions of their packages only to have them later changed by an inappropriate system. The legal theory advanced, and supported by the record, shows that Barber Auto's claims are typical of the class members' claims.

**4.**   **Adequacy of Representation.**

Rule 23(a)(4) requires that the named Plaintiff fairly and adequately protect the interests of the members of the class.  Adequate representation presents two questions: (1) whether Class Counsel are qualified, experienced and generally able

to conduct the proposed litigation;[7] and (2) whether the named plaintiff has interests that are antagonistic to the class.  <u>Griffin v. Carlin</u>, 755 F.2d 1516, 1533 (11th Cir. 1985).  <u>See also</u>, <u>In re Asbestos School Litigation</u>, 104 F.R.D. at 430; <u>Pettco Enterprises, Inc. v. White</u>, 162 F.R.D. 151 (M.D. Ala. 1995).  The question as to adequacy of counsel has been answered in the zealousness with which Class Counsel has pursued this case.  Grammas Decl., ¶¶ 3, 4, 5, 7, 9; Pantazis Aff., ¶¶ 8-15.  Mr. Barber understands that he represents both his company, individually, and all others similarly situated.  Barber Depo. pp. 221, 227-228, 267.  He participated in the process involved in prosecuting a class action, Barber Depo. pp. 221-223, 225-226, and is willing to do "whatever it takes" to fairly represent this class.  Barber Depo. pp. 234-35.  In short, Mr. Barber understands his duties as a class representative and is more than willing to and capable of executing them.

**B.    <u>Rule 23(b)(3) Requirements are Met</u>.**

Rule 23(b)(3) requires that common questions "predominate" over individual ones and that the class action be superior "for the fair and efficient adjudication of the controversy."  Rule 23(b)(3) requires that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized

---

[7]UPS has stipulated that Class Counsel are adequate, qualified and have the experience necessary to prosecute this action.  Thus, this element will not be discussed here.  However, affidavits have been filed to support this stipulation. (<u>See</u> affidavits of Dennis G. Pantazis and Peter A. Grammas).

proof.  <u>Jackson v. Motel 6 Multipurpose, Inc.</u>, 130 F.3d 999, 1005 (11th Cir. 1997).

"In order to 'predominate,' common issues must constitute a significant part of the

individual cases." <u>Jenkins v. Raymark Industries, Inc.</u>, 782 F.2d 468, 472 (5th Cir.

1986).  Moreover,

> A single common issue may be the overriding one in the
> litigation, despite the fact that the suit also entails
> numerous remaining individual questions . . . . In finding
> that common questions predominate over individual ones
> in particular cases, courts have pointed to such issues that
> possess the common nucleus of fact for all related
> questions, have spoken of a common issue as the central,
> or overriding question, or have used similar articulations.

1 Newberg on Class Actions 3d (1992) § 4.25 at 4-85 to 4-86 (internal citations

omitted).  The central and predominant issue in this case is whether UPS's system

of auditing package dimensions in order to assess SCCs is appropriate. That is a

question that UPS's own representative has testified would be answered in the

same fashion for each class member.

"Rule 23(b)(3)'s superiority requirement compares the class action device

"to other available methods for fair and efficient adjudication of the controversy."

<u>Newberg on Class Actions</u>, § 4.27, p. 4-108.  This is particularly important in this

action because of the small amount of most individual claims.  The Supreme Court

in <u>Phillips Petroleum Co. v. Shutts</u>, 472 U.S. 797, 809, recognized that without a

class action, many small claims would never be adjudicated.

> Class actions also may permit the plaintiffs to pool
> claims which would be uneconomical to litigate
> individually... This lawsuit involves claims averaging
> about $100 per plaintiff; most of the plaintiffs would
> have no realistic day in court if a class action were not
> available.

Id.

A claim for the breach of a standard form contract is clearly manageable. The Eleventh Circuit allowed a nationwide class action to proceed through a trial under similar circumstances where Exxon dealers across the country sued for its alleged breach of a standard form contract provision.  See, Allapattah Services, Inc. v. Exxon Corp., 333 F.3d 1248, 1260-61 (11th Cir. 2003).

Similarly, the Court in Meyer v. Cuna Mutual Group, 2006 U.S. Dist. Lexis 4478 (W.D. Penn. 2006).  The Meyer Court certified a "form contract" claim, holding that:

> Once [the question of liability] is answered, if it is
> answered in favor of the class, a global settlement . . .
> will be a natural and appropriate sequel.  And if there is
> no settlement, that won't be the end of the world.  Rule
> 23 allows district courts to devise imaginative solutions
> to problems created by the presence in a class action
> litigation of individual damages issues.  Those solutions
> include "(1) bifurcating liability and damage trials with
> the same or different injuries; (2) appointing a magistrate
> judge or special master to preside over individual
> damages proceedings; [and] (3) decertifying the class
> after the liability trial and providing notice to class
> members concerning how they may proceed to prove
> damages . . . . (quoting Judge Posner in Carnegie v.
> Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004).

<u>Meyer v. Cuna Mutual Group</u>, 2006 U.S. Dist. Lexis 4478 at *70.   A global settlement is exactly what occurred in this case.   In <u>Kleiner v. First Nat'l Bank of Atlanta</u>, 97 F.R.D. 683 (N.D. Ga.1993), the Court held that, "[w]hen viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment of the class action, and breach of contract cases are routinely certified as such." <u>Id</u>. at 693.

> The aggregation of individual claims in the context of a classwide suit is an evolutionary response to the existence of injuries unremedied by the regulatory action of government.  Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.

<u>Deposit Guaranty Nat'l Bank v. Roper</u>, 445 U.S. 326, 339 (1980).  While a lengthy and complex trial would have been manageable in this case, all can agree that the settlement of such an action is to be desired and encouraged.[8]   As such, manageability concerns have been handled in accordance with that the courts have called the "natural and appropriate sequel", <u>Meyer</u>, <u>supra</u>, a fair, adequate, and reasonable settlement.

---

[8]To state the obvious, "Settlements benefit everyone in the process and everything that can be done to encourage such settlements – especially in complex class action cases – should be done." <u>Lipuma v. Am. Express Co.</u>, 406 F.Supp.2d 1298, 1324 (S.D.Fla.2005), quoting <u>In re M.D.C. Holdings Sec. Litigation</u>, 1990 U.S.Dist. Lexis 15488 (S.D.Cal.1990).

C.      **The Settlement of this Case Is Fair, Reasonable, and Adequate.**

1.      **The Notice in this Case Was Reasonable.**

Before discussion of the settlement terms, it is necessary to consider the notice, both in terms of substance and distribution.  The notice must provide class members "information reasonably necessary to make a decision [whether] to remain a class member, and be bound by the trial judgment, or opt out of the action."  The notice, however, need not include "every material fact or be overly detailed."  Faught v. American Home Shield Corp., 2011 U.S.App. Lexis 22073 (11th Cir., Oct. 331, 2011), quoting In re Nissan Motor Corp. Antitrust Litigation, 552 F.2d 1088, 1104-1105 (5th Cir. 1977).

The notice in this case sets forth the allegations of the action.  More importantly, the notice sets out in plain language that there is: (a) a Cash Fund from which class members may request cash for their SCCs; (b) a Compensation Fund from which class members may receive a dollar for dollar credit for SCCs received in the future; and (c) explicit instructions for how to participate in either of these two funds, or how class members may exclude themselves from the settlement, and the effects of those decisions

The idea that the notice does not inform the class members that their claims may be reduced based upon participation in the Cash Fund is simply not true.  The notice itself states that the refund amounts cannot be determined at this time

because "it will be based on the number of people in the settlement class, the number of claims received, and the amount of adjusted charges paid by each class member..."   At the time notice was delivered, the amount of a class member's recovery was unknown, and the class was informed of this by the notice.  The total amount of the settlement, and the mode of distribution were made known in the notice.  Moreover, the notice directs class members to the website, upon which the complete Settlement Agreement may be accessed, fully explaining how participation in the various funds can affect payments and credits.  It is simply not credible to say that the class members do not have complete access and notice of all terms of the Settlement Agreement.

All addresses and telephone numbers are prominently displayed.   In addition, class members are given a website address for further questions, and a toll free number to call with any questions.  In short, it would be difficult to argue that the notice is either: (1) confusing; or (2) does not provide the class members with sufficient information to make claims, opt-out, or file an objection.

No objection has been raised as to the method of notice, nor could there be. In this case, the class members receive individual notices of the settlement.  The notice was sent to either the email address or last known address of each class member.  Individual notice, such as was achieved in this case, complies with Rule 23's requirement that notice be directed to class members by the best method "that

is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c)(2)(B); In re Healthsouth Corporation Securities Litigation, 334 Fed.Appx. 248, 254 (11th Cir. 2009). No notice can be more effective than individual notice, and that has been achieved in this case.

**D.   The Substance of the Settlement Is Fair, Adequate, and Reasonable.**

    **1.   The Operation of the Funds.**

The settlement provides a common fund of approximately $16.5M in benefits, of which, $12M is exclusively to be paid out to the class, as well as additional prospective relief. The settlement provides a refund of all SCCs for those who choose to make claims. First, there is the $2M Cash Fund from which a class member may make a claim and be paid cash. Second, there is a $10M Compensation Fund from which, instead of receiving a cash payment, a class member may make a claim and receive a dollar for dollar credit for SCCs occurring after the effective date of the settlement.

The Compensation Fund has characteristics that make it more advantageous for members of the class, and less advantages to UPS than a "coupon" to be used for future purchases. The Compensation Fund does not revert to UPS. In other words, there is no way in which the entirety of the $10M will not be used for the benefit of UPS customers/class members. This is in line with the Cash Fund

reversion feature in which monies remaining in the fund after the claims deadline revert to the Compensation Fund.  The monies to be paid out are real, to be paid out *in toto*, and cannot lie fallow in the coffers of UPS like a coupon settlement.

The non-reverting nature of the Compensation Fund operates as further prospective relief.  The fact that some UPS customers who are not class members may take advantage of the Compensation Fund does not negate the fact that those who **are** class members may make claims from that fund.  In fact, the evidence is that the great majority of persons who will make claims against the Compensation Fund are class members.  UPS's customer retention is such that eighty-nine percent (89%) of the class members are current customers. These persons will have the opportunity, not only to make claims for past SCCs, but also to have future SCCs refunded, without having to prove a breach of contract for each charge.   The Compensation Fund operates as prospective or injunctive relief that benefits not only the class, but like any injunctive relief on behalf of a class, see <u>infra</u>, all similarly situated persons in the future.

## 2. <u>The Funds Meet the Standard for Fairness and Reasonableness</u>.

A settlement is to be reviewed for its fairness, reasonableness, and adequacy. <u>Faught v. American Home Shield</u>, <u>Supra</u>, citing <u>Holmes v. Cont'l Can Co.</u>, 706 F.2d 1144, 1147 (11th Cir., 1983).  The following factors are to be considered: (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the range of

possible recovery that is fair, adequate, and reasonable; (4) the anticipated complexity, expense, and duration of litigation; (5) the opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved. Faught, Supra; Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984).  This settlement passes these tests.

Plaintiffs, as in any civil action, face a risky road to recovery, and UPS has vigorously denied every allegation in the Complaint.  In this case, however, there is another entire additional layer of scrutiny to be overcome in order to achieve class recovery.  While this Court had certified this action as a class, UPS filed a Petition for Interlocutory Review of that decision, pursuant to Fed.R.Civ.P. 23(f). As the Court is well aware, interlocutory review of an Order granting class certification is discretionary.  The Eleventh Circuit exercised that discretion, and was in the process of reviewing this Court's Class Certification Order, after oral argument, when the settlement was achieved.  If the Eleventh Circuit were to reverse this Court's class certification Order, this case would be effectively over as a class action.

Even if the Eleventh Circuit affirmed, *in toto, this* Court's Certification Order, the case would be vehemently opposed at trial, and most likely at the summary judgment stage, in addition to the appellate process. Defendant's able counsel has retained two nationally renowned experts concerning the Dimensional

Measurement Weight Measurement machines at the heart of this controversy, and would have elicited testimony concerning the wide use of the machines, a rigorous inspection and testing program, and various government certifications of these machines.  There were simply no guarantees of success at trial.  Finally, Defendant would have presented evidence relating to actual mis-measurement by customers, which would defeat claims.

The range of possible recovery for the class members is from zero to 100% of their SCCs.[9]  This is a simple breach of contract case, and no extra-contractual damages could have been awarded.  One of the elements the Court must consider in approving this settlement is the range of possible recoveries if the action were tried.  Because of the manner in which UPS maintains its records, it is impossible to know the exact high end dollar amount of potential recovery. Statistically, however, based on the discovery and data provided, and evidence submitted, the high end range of damages plaintiffs could possibly recover in this action is approximately between $70M and $90M.  Pantazis Aff. ¶ 16.  This amount is only possible if all overcharges were awarded with no offsets.  Pantazis Aff. ¶ 16.  And was Plaintiff successful at that level, the amount distributable would have to be reduced by appropriate expenses and attorneys' fees.  In such a case, a distributable

_____

[9]The adequacy of the $2M Compensation Fund is not challenged by the lone objector in this case.

fund of $12M is fair given the risks of litigation.  See, Bennett v. Behring Corp., 737 F.3d 982, 986 (11th Cir. 1984) (policy favors settlement, and compromise is essence of settlement).

However, before any claimant could have recovered in litigation, a breach of contract had to be proven, i.e., that the customer properly input the dimensional data, and that the machines were inaccurate to the level that any adjustment based upon such measurements would be inappropriate, and a breach of the contract.  For those making claims, under either the Cash Fund or the Compensation Fund, the claims will be made for the entirety of what could be gained at trial.[10]  That certainly is fair and adequate given the risks of litigation, where under Bennett, supra, a reasonable settlement may amount to only a fraction of possible recovery.

While the outcome of a trial would be far from certain, it can be said with absolute certainty that a trial of this matter would be expensive and lengthy.  There would be multiple expert witnesses for both parties, and a lengthy list of technically intensive fact witnesses, most likely, non-party witnesses from the manufacturers of the equipment at issue.  The Court is well aware of the length and complexity of expert and technical testimony dealing with intricate, sensitive, equipment, and the recordation of literally millions of records from that equipment.

---

[10]Not every person assessed a SCC is a class member.  The class is limited to those who input their measurements into UPS's shipping system.  The prospective relief does end at $10M, however, that fund pays SCCs dollar for dollar until it expires.

Indeed, the volume of material was such that to analyze even a slice worth of data, would require rental of space on a mainframe computer.   Merits discovery expenses had not yet been incurred, not to mention trial costs, but Plaintiff has already spent in excess of $100,000.00 in expenses in this case.   Suffice it to say, proceeding in this case would have been costly and risky.

While the case had not yet been prepared for trial on the merits, it had already been litigated for five (5) years.   This is not a case where the contours of the case had not been discovered by the parties.   Hundreds of thousands of documents have been exchanged, Grammas Decl., ¶ 3, numerous depositions have been taken both in Birmingham and Atlanta, Grammas Decl., ¶ 3, and the case had proceeded to an appeal on the class certification question.   Moreover, mediation was attempted prior to the certification process, and was unsuccessful, Grammas Decl., ¶ 4, Max Decl., ¶ 2.   It was only after the significant task of litigating class certification, and an appeal of that decision, had been completed that the parties were able to make the kind of risk assessment necessary to effectuate a fair and reasonable settlement.

Lastly, despite individual notice to over 1.5 million class members, the Court received one objection (by what appears to be a married couple) to the settlement, and only 194 class members have opted out.   These numbers are strong indicators of the fairness of a settlement.   Ass'n for Disabled Americans, Inc. v.

Amoco Oil Co., 211 F.R.D. 457, 617 (S.D.Fla. 2002).  It is noteworthy that this one objection is represented by a "law firm" known as the "Center for Class Action Fairness", which can only be described as a group of professional objectors.  Not only are the lawyers professional objectors, but the objector himself in this case, Mr. Heaser, is on his second "project" working with the professional objectors to class action settlements.  Out of 1.5 million notices delivered to the class, only two people, with "help" from one professional objector, has raised any objection to the settlement.  As shown in the joint motion and brief for final approval, even this objector agrees that the Court would be within its discretion to approve the settlement.

**E.**   **The Fee Awarded in this Case Is Reasonable.**

In this case, a fund of approximately $16.5M has been created for the benefit of the class.  That fund consists of four components: (1) the Cash Fund; (2) the Compensation Fund; (3) the expenses of the litigation; and (4) an attorneys' fee.  The total fee taken out of that common fund is $3,895,368.29, or 23.6% of the $16M fund created.  This is well within the 25% benchmark for attorneys' fees in a common fund case.

**1.**   **The Common Fund Includes the Cash Fund and the Compensation Fund.**

In Camden I Condo Assoc. v. Dunkle, 946 F.2d 768, 774 (11th Cir. 1991), the Eleventh Circuit announced the rule that, "Henceforth, in this Circuit,

attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." Carpenters Health & Welfare Fund v. Coca Cola, Co., 587 F.Supp. 2d 1266, 1268 (N.D.Ga. 2008). There is little doubt that the common fund includes the $2M Cash Fund. Similarly, there should be little doubt that the common fund includes the $10M Compensation Fund. The Compensation Fund is money that may be claimed directly by class members for SCCs, and is a dollar for dollar repayment. Objectors' attempt to characterize the Compensation Fund as a "coupon", or to argue that these monies do not benefit the class, are unavailing.

### a.   The Compensation Fund Is Not a "Coupon".

Although not clearly defined by statute or case law, a coupon settlement is typically found only where the relief constitutes "a discount on another product or service offered by the defendant in the lawsuit." Fleury v. Richemont North America, Inc., 2008 WL 3287154, at *2 (N.D. Cal. Aug. 6, 2008). The credits to be taken in this case are not discounts on products. Rather, they are a refund of shipping charges levied upon the class members.[11]  In other words, the credits provide no independent incentive to use UPS's services. Rather, only after a class member has already decided to ship with UPS are the credits available to remedy

---

[11]As to the charge that the Compensation Fund cannot be used by the class members, this is just not true. While the Compensation Fund covers SCCs after the class period, the overwhelming majority of those who can make such a claim are class members as 89% of the class members are current UPS customers, eligible to make claims for future SCCs after the effective date of the settlement.

the exact wrong this lawsuit was filed to correct – inappropriate charges.  These credits, which do not revert to UPS, do not meet the criteria for coupon settlements even under the case upon which the objectors rely.

Coupon settlements "often do not provide meaningful compensation to class members; they often fail to disgorge ill gotten gains from the defendant; and they often require class members to do future business with the defendant in order to receive compensation.  True v. American Honda Motor Corp., 749 F.Supp.2d 1052, 1062 (C.D.Cal. 2010), quoting Figueroa v. Sharper Image Corp., 517 F.Supp.2d 1292, 1302 (S.D.Fla. 2007).  The credits in this case do not fit into these categories.  First, the credits do provide meaningful compensation to class members.  89% of the class members are current UPS customers.  They have chosen to continue to do business with UPS, not in order to redeem the Compensation Fund "coupons", but because they have chosen to ship packages with UPS for independent business reasons.  The compensation provided by the Compensation Fund is not a discount off of a future purchase, but rather is a full credit against charges UPS will charge in the future.  The decision to use UPS will have already been made before any SCCs can be refunded by the Compensation Fund.  This is prospective, monetary relief that does not incentivize a customer to do business with UPS.  Instead, it remedies the breach of contract upon which this lawsuit is based.

Second, these credits specifically disgorge what Plaintiff claims are ill-gotten gains from UPS.  The credit amounts **never** revert to UPS.  As such, the Compensation Fund does not mirror monies a company keeps from unused coupons.

Finally, in this case, UPS customers who take advantage of the credits have not bought additional UPS services that they otherwise would not have bought, conferring a benefit upon UPS as a result of the lawsuit.  Claims from the Compensation Fund only disgorge SCC monies UPS otherwise would have kept.  UPS customers who take advantage of the credit will have made an independent decision to use UPS for shipping, and then, through the credits, will take directly from UPS's coffers monies they otherwise would be paid in the form of SCC fees.

### b. <u>Even If the Compensation Fund Were Considered a "Coupon", The Fee Is Proper</u>.

Even if the $10M Compensation Fund were deemed a "coupon", such a designation does not mean that the settlement, or the attorney fee, are unreasonable.  <u>True</u>, 749 F.Supp.2d at 1069 ("This does not mean that a coupon settlement can never be approved as fair, adequate, and reasonable...").  The Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1712, provides for the proper analysis of a settlement deemed a "coupon" settlement.  The statute says that, "If a proposed settlement as a class action provides for recovery of coupons to a class member, the portion of any attorneys' fee award to Class Counsel that is

attributable to the award of the coupons shall be based on the value to the class members of the coupons that are redeemed." Id.  In this case, if the Compensation Fund is considered "coupons", then none of that amount can be considered unredeemable because none of that money ever reverts to UPS.  It is a certainty that all $10M will be used.  The Settlement Agreement states that, "Credits will remain available until the amounts in the Dimensional Weight Compensation Fund are exhausted."  As such, the entire $10M amount can be used to determine the value of the fund from which to award attorneys' fees.

### c.   The Compensation Fund Operates Prospectively and Is Properly Valued as Injunctive Relief.

The Compensation Fund operates prospectively and requires UPS to pay class members for SCCs received after the effective date of the settlement.  It is a cash benefit.  If not considered monetary relief, it certainly operates as injunctive relief to be valued in determining a proper attorneys' fee.

> Moreover, when determining the total value of a class action settlement for purposes of calculating the attorneys' fee award, courts usually consider not only the compensatory relief, but also the economic value of any prospective injunctive relief  obtained for the class. See, e.g., Staton v. Boeing Co., 327 F.3d 938, 974 (9th Cir. 2003) ("[C]ourts should consider the value of the injunctive relief obtained as a relevant circumstance in determining what percentage of the common fund class counsel should receive as attorneys' fees.") (internal quotation and citation omitted); Sheppard v. Consol. Edison Co. of New York, Inc., 2002 U.S. Dist. LEXIS 16314, 2002 WL 2003206, at *7 (E.D.N.Y. Aug. 1,

2002) (in valuing total settlement for percentage-based attorneys' fee award, court included $6.745 million in monetary relief and "an estimated $5 million in non-monetary, injunctive relief"); <u>Steiner v. Williams</u>, 2001 U.S. Dist. LEXIS 7097, 2001 WL 604035, at *4 (S.D.N.Y. May 31, 2001) ("Although the settlement in this action did not involve the payment of money by the defendants, counsel may nonetheless recover a fee if the settlement conferred a substantial non-monetary benefit.").

<u>Pinto v. Princess Cruise Lines</u>, 513 F.Supp.2d 1334, 1342-43 (S.D.Fla.2007). Thus, even if the $10M fund were somehow not considered to be a direct monetary benefit to the class, because UPS is obligated to pay these monies, the Compensation Fund can only be considered injunctive relief.  As such, the $10M should be included within the value of the common fund created for the benefit of the class.[12]

### 2.   **The Common Fund Includes the Expenses and the Costs of Administration.**

The benefit to the class, or common fund, in this case includes the expenses of litigation, and the costs of administrating the settlement.  The benefits conferred by the two funds are not just magically transferred to the class members.  In

---

[12]Any argument that this $10M Compensation Fund does not benefit the class can be discounted quickly.  First, as a factual matter, 89% of the class members are current customers who can make claims under the Compensation Fund.  By definition, all class members are eligible to continue UPS services and, hence, are eligible to participate in the Compensation Fund.  Second, injunctive relief, by its very nature, will benefit non-class members.  For instance, actions usually in the civil rights context, for damages often include injunctive relief aimed at reforming institutional behavior that necessarily affects those who will come in the future, and not class members only.  <u>See</u> <u>LaMarca v. Turner</u>, 995 F.2d 1526 (11th Cir. 1993); <u>Lea v. Cone Mills Corp.</u>, 438 F.2d 86 (4th Cir. 1971) (fees awarded on injunctive relief only in discrimination case).

addition to the attorneys' fees discussed *infra*, the common fund includes the litigation expenses of $104,631.71 expended by Class Counsel, Pantazis Aff. ¶ 10, Grammas Decl. ¶ 7, and the $500,000.00 cost of administrating the settlement. The law is that, "Whether the cash portion of the settlement is used to pay attorneys or to distribute certificates to class members, the expenditures of the fund inure to the benefit of the class.  Accordingly, the Court rejects the argument that the calculation of the value of the common fund should exclude all cash used to pay attorneys' fees and the expenses of claims administration." In re Domestic Air Transp. Antitrust Litigation, 148 F.R.D. 297, 354 (N.D.Ga. 1993); Bradburn Parent Teacher Store, Inc. v. 3M, 513 F.Supp.2d 322 (E.D.Pa.2007) ("Attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable litigation expenses from the fund" including settlement administration), quoting In re Aetna, Inc. Securities Litig., 2001 U.S. Dist. Lexis 68 (E.D.Pa. 2001); In re Southern Ohio Correctional Facility, 175 F.R.D. 270, 274 (S.D.Ohio 1997) (included in common fund are reimbursable expenses including litigation and settlement administration expenses).   The benefit to the class from which attorneys' fees may be calculated includes the necessary expenses in creating that fund (litigation costs), and administrating that fund (settlement administration costs).  This is approximately $600,000.00 in this case.

### 3.   **The Common Fund Includes Attorneys' Fees.**

"As the Supreme Court acknowledged in Boeing Co. v. Van Gemert, 100 S.Ct. 745, 749 (1980), this court has recognized consistently that a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole." Barton v. Drummond, Co., 636 F.2d 978, 982 (5th Cir. 1981), quoting Boeing, supra.  "The doctrine...rests on the principle that non-parties who reap substantial benefits from litigation without contributing to its costs should not be unjustly enriched."  In re J.H. Inv. Svcs., Inc., 418 B.R. 413, 425 (M.D.Fla. 2009), Hillis v. Equifax Consumer Services, 2007 U.S. Dist. Lexis 48278 at *8 (N.D.Ga. ||June 12, 2007).

In this case, the common fund from which attorneys' fees are to be calculated includes the $12M in benefits going directly to the class members, and also expenses, the costs of settlement administration, and the attorneys' fee.  If it did not, then the amount available to the class would be far less than the $12M to be distributed.  If the common fund did not include attorneys' fees, litigation expenses, and settlement administration expenses, all of the amounts would have to be subtracted from the $12M available to the class, severely reducing that amount. Instead, the fund available to the class was negotiated first, Max Decl., ¶ 5, Grammas Decl., ¶ 5, with the knowledge that the other expenses, including

attorneys' fees, would be paid <u>in addition to</u> the $12M available for distribution to the class.  This manifest principle was specifically recognized, <u>supra</u>, in <u>In re Domestic Air Transp.</u>, when the Court "rejected" the argument that the common fund amount should, "exclude all cash used to pay attorneys' fees and the expenses of claims administration." <u>In re Domestic Air Transp.</u>, 148 F.R.D. at 354.

    **4.**    **<u>The Fee Requested Is Within the Camden I "Benchmark"</u>.**

The <u>Camden I</u> Court held, "Henceforth, in this Circuit, attorneys' fees awarded from a common Fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." <u>Camden I</u>, 946 F.2d at 774.  The Court then set forth the 25% benchmark referred to above.  <u>Id.</u>  In this case, the total fund from which class benefits, litigation expenses, and settlement administration are to be paid is $16.5M, the fee portion of the $4M requested is $3,895,368.29, which is 23.6% of the total fund.  This is within the <u>Camden I</u> benchmark, and is properly awardable to Class Counsel in this action.

    **5.**    **<u>The "Johnson" Factors Are Satisfied</u>.**

The recent <u>Faught</u> decision, <u>supra</u>, reiterated that the majority of fees in common fund cases are reasonable where they fall between 20-25% of the fund. <u>Faught</u>, 2011 U.S.App. Lexis 22073 (11th Cir. Oct. 31, 2011).  A further consideration is whether the fee meets what are referred to as the "Johnson" factors

first articulated in <u>Johnson v. Highway Express</u>, 488 F.2d 714, 717-19 (5th Cir.

1974).  These factors are:

> (1) the time and labor required; (2) the difficulty of the
> issues; (3) the skill required; (4) the preclusion of other
> employment by the attorney because he accepted the
> case; (5) the customary fee in the community; (6)
> whether the fee is fixed or contingent; (7) time
> limitations imposed by the client or circumstances; (8)
> the amount involved and the results obtained; (9) the
> experience, reputation, and ability of the attorneys; (10)
> the undesirability of the case; (11) the nature and length
> of the professional relationship with the client; and (12)
> awards in similar cases.

<u>Faught</u>, <u>supra</u> at *21-22.

Objectors ignore the well stated and well accepted benchmark for attorneys'

fees, and rely upon <u>In re Bluetooth Headset Products Liability Litigation</u>, 2011

U.S. App Lexis 17224 (9th Cir. August 17, 2011) to argue that the settlement in this

case evidences indicia of "self-dealing".  The three factors the <u>Bluetooth</u> Court

identifies are: (1) a fee that is a disproportionate distribution of the settlement; (2) a

"clear sailing" agreement; and (3) non-reversion of fees.  Even if <u>Bluetooth</u> were

applicable, none of these factors are present.

The settlement's true value to the class is over $16.5M – $2M in the Cash

Fund, $10M in the Compensation Fund, and $4M in attorneys' fees and costs

(including $500,000.00 for settlement administration).  The fee of $3,895,368.29 is

not a "disproportionate" benefit to the class, but in line with Eleventh Circuit

precedent that a fee award of less than 25% of a settlement's value is typically appropriate.  See Faught v. American Home Shield Corp., 2011 WL 5119115 at *7 (11th Cir. Oct. 21, 2011) ("this court has often stated that the majority of fees in these cases are reasonable where they fall between 20-25% of the claims").  Thus, the Parties' agreement with respect to Class Counsel's fees is not evidence of "self-dealing", nor does it provide any basis to object to the settlement.

Heaser also objects to the fact that UPS has agreed not to oppose Class Counsel's fee award.  Such "clear sailing" provisions are appropriate and routinely approved by courts.  See Waters v. Intern. Precious Metals Corp., 190 F.3d 1291 (11th Cir. 1999) (holding that district court did not abuse discretion in approving settlement and awarding attorneys fees with a "clear sailing" provision, and noting that other courts have determined that such agreements are essential to settlement, because "the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged") (internal citations omitted).  It is appropriate and reasonable that UPS would agree not to oppose Class Counsel's fee request on the basis that it was a negotiated-for and agreed-upon number by both Class Counsel and UPS's counsel **after** the class benefit was agreed upon. There would be little point to agreeing upon a fee award if that agreement is later subject to revocation or objection.

Heaser objects to the "kicker" provision, which purportedly reverts unawarded Class Counsel fees to UPS, and not to the Class members.  This objection does not apply here because it ignores the difference between "common-fund" settlements and settlements in which a fee agreement is reached separately and independently of the class recovery, like this case.  In this Settlement, the Class benefit – $12M in total, plus injunctive relief and Settlement administration costs – will not be reduced or otherwise impacted should Class Counsel not receive the entire $4M in fees and expenses.  Class relief is wholly independent of fees for Class Counsel.  Lower fees awarded to Class Counsel would not increase the Class benefit, nor would higher fees for Class Counsel decrease the Class benefit.  Structuring the Settlement otherwise could create a conflict of interest between the Class and Class Counsel.  The agreement of UPS and Plaintiff on fees is not a "kicker" provision, nor is it evidence of self-dealing.  If anything, the separate negotiation of attorneys' fees after the negotiation of the Class benefit ensured that the benefit to the Class was not reduced in favor of the fee award.

Lastly, Bluetooth is readily distinguishable.  In Bluetooth, the Ninth Circuit remanded a class settlement so that the district court could consider several factors in deciding whether to approve the fee award at issue. The Ninth Circuit expressly noted that the fee award was not necessarily inappropriate, even though it was eight times the amount of the settlement benefit.  Id. at 945 ("[w]hile we cannot

say the disproportion between the fee award and the benefit obtained for the class was per se unreasonable…").

There are several distinctions between <u>Bluetooth</u> and this settlement.  The most glaring distinction is that the <u>Bluetooth</u> class members did not receive any monetary recovery from the settlement.  Instead, the <u>Bluetooth</u> settlement provided for a *cy pres* payment of $100,000 with a fee award of $800,000.  <u>Bluetooth</u>, 654 F.3d at 938.  The <u>Bluetooth</u> settlement also contained a general release by the class as opposed to the limited release of claims from the class members in this settlement.  Id. at 939.  In <u>Bluetooth</u>, the Ninth Circuit also noted that "collusion" may be more likely in cases in which a settlement is reached pre-class certification, a consideration that does not apply here.  <u>Id</u>. at 946.  Moreover, the parties in <u>Bluetooth</u> failed to present evidence that the fee was reached only after settlement benefits for the class were obtained.  <u>Id</u>. at 938.  In contrast, the fee award here was proposed by the mediator and agreed upon by both Parties only after settling the class relief.  The Ninth Circuit's decision in <u>Bluetooth</u> is clearly distinguishable from this settlement.

### a.   <u>Time and Labor Required, and Preclusion of Other Employment (Factors 1, 4).</u>

There is no question that the litigation of this case was time and labor intensive.  5888.886 hours were expended in fighting through all obstacles presented by able defense counsel.  There is simply no question that, even based

upon a lodestar calculation, the time expended justifies the fee in this case.  There is similarly no question that Plaintiff's attorneys litigated this case at a high level to the exclusion of other work that could have been performed.

### b.   Difficulty of Issues and Skill Required (Factors 2, 3).

In this case, great skill was required to oppose well funded, diligent defense counsel in a class action concerning highly technical subject matter.  Class Counsel had to navigate the federal appellate courts, and shepherd the breach of contract claims through FAAA preemption. This is difficult work performed at a high level, and justifies a fee in keeping with Camden I.

### c.   The Fee Is Customary for Contingent Class Actions by Attorneys of the Reputation of Class Counsel (Factors 5, 6, 9, 12).

As stated throughout, a contingent common fund fee for a successful Plaintiff's class action is approximately 25%.   In this case, the fee of $3,895,368.29 is 23.6%.  Even when lodestar is used as a "check", infra, the fee is proper.   Attached hereto as Ex. G is the Declaration of Joe Whatley, who has practiced in the area of class actions for years.  His opinion is that the fees are reasonable, and in line with what similarly situated counsel in the community command.

### d.  <u>The Result Was Timely and Reasonable (Factors 7, 8)</u>.

As stated above, the result took five years to obtain, but it could have taken much longer.  Having reached a fair settlement, class members can realize now, as opposed to years down the line and then only if successful, these benefits.  The reasonableness analysis, <u>supra</u>, shows that given the uncertainties of litigation, the result is a real benefit to the class.

### e.  <u>The Case Is a Small Recovery Case, Economically, Undesirable as an Individual Case (Factors 1, 4)</u>.

As Mr. Okon testified, the proof in this case would be the same, whether litigated individually, or as a class.  The problem is that an individual recovery would not support the time and expense of this case.  As such, the fee requested is reasonable as a percentage of a common fund, which is lower than most individual continent fee agreements.

## F.  <u>The Requested Fee Is Allowed Under CAFA Even If The $10M Compensation Fund Were Determined To Be A "Coupon"</u>

Even in the unlikely event that the $10M Compensation Fund is considered a coupon, the requested fee is supportable under CAFA, 28 U.S.C. §1712(b)(2). The statutory language states that, "nothing in this section shall be construed to prohibit application of a lodestar <u>with a multiplier</u> method of determining attorneys' fees."   In this case, the combined lodestar of Class Counsel is $2,788,803.70.

While not mandating the lodestar and multiplier approach,[13] the Court in

Radosti v. Envision EMI, LLC, 760 F.Supp.2d 73, 78 (D.D.C. 2011), stated that,

"the statute explicitly contemplates application of the lodestar with a multiplier..."

Id.  As stated above, this case is a risk intensive venture undertaken by attorneys

who have devoted a significant amount of time to it.  This time is to the exclusion

of other potentially profitable matters.    A reasonable multiplier of the

$2,788,803.70 lodestar amount (1.45) in this case due to the contingent nature of

the representation merits award of the fee requested.

## G.    **The Lodestar Calculation, Used as a Check, Justifies the Fee in this Case.**

This is a breach of contract case.  It is not a fee shifting case.  As such, under

Camden I, the "percentage of the common fund" method is appropriate for the

purposes of determining an appropriate attorneys' fee.  Indeed, after announcing

that the percentage of the fund method is the proper method for determining fees in

cases where a common fund is created, the Eleventh Circuit commented on the

---

[13]Not only does Radosti not mandate a lodestar approach, indeed the Court stated, "[I]n class action cases in which the plaintiff class recovers benefits from a common fund, the favored method of calculating attorneys' fee is to award a percentage of the fund.  Such awards are favored because they align the interests of the class and its counsel and provide a powerful incentive for the efficient prosecution and early resolution of litigation.  Radosti, 760 F.Supp.2d at 77, citing Wells v. Allstate Ins. Co., 557 F.Supp.2d 1, 6 (D.D.C. 2008).  The Radosti Court approved of the fee in that case on a percentage of the fund basis using vouchers redeemed as a multiplier, even though the only relief provided was voucher to be used for future business with the defendant.  The Court found the percentage of the fund to be proper because it was based upon, "the amount of money Envision was willing to spend to settle the litigation."  Id.  In this case, like Radosti, the value of the fund is calculated based upon monies that the defendant will actually pay out, not that might be redeemed as coupons.  A common fund approach, based upon the $16.5M UPS is willing to spend to end this litigation, is proper.

proper place for determining fees based upon a lodestar analysis.  The <u>Camden I</u>
Court stated, "the lodestar analysis shall continue to be the applicable method used
for determining statutory fee shifting awards."  <u>Camden I</u>, 946 F.2d at 774.

Notwithstanding the rejection of lodestar analysis for a breach of contract
case like this, courts have used the lodestar method as a "check" on the percentage
of the fund requested.  <u>Dikeman v. Progressive Express Ins. Co.</u>, 312 Fed.Appx.
168, 172 (N.D.Fla. 2008); <u>Holman v. Student Loan Xpress</u>, 778 F.Supp. 1306,
1314 (M.D.Fla.2011) (suitable for district courts to cross-check the percentage fee
award against lodestar method).

In this case, that "check" reveals the reasonableness of the fee.  Class
Counsel, in litigating this case against able and well funded defense counsel, have
expended 5888.86 hours in prosecuting this action.  At reasonable rates, this comes
to a lodestar aggregate of $2,788,803.70 before any multiplier of the lodestar
amount.

As the Court is aware, this labor and document intensive case was
undertaken on a purely contingent, at-risk, basis by the Class Counsel.  When that
is the case, it is not uncommon for an enhancement multiplier to be used in the
calculation of the fee.  <u>Davis v. Locke</u>, 936 F.2d 1208, 1215 (11th Cir. 1991)
(affirmed 1.6 enhancement multiplier "to compensate for the risk associated with a
contingency fee."); <u>Camden I</u>, 946 F.2d at 772 (adjustment of lodestar for

contingency for final lodestar determination).   In a common fund case, a lodestar and multiplier is used as a "check" against the fee sough.   "[A] reasonable attorneys' fee is calculated by determining the lodestar amount – i.e., the number of hours counsel reasonably expended multiplied by a reasonable rate for similar work – and then multiplying the lodestar amount by such a subjective 'multiplier' to compensate for the risk of litigation." Been v. O.K. Indus., 2011 U.S. Dist. Lexis 115151 *29 (E.D. Okl. 2011).   "A multiplier of four or less is commonly accepted as reasonable." Id. citing, Roe v. Cheyenne Mtn. Conf. Resort, Inc., 124 F.3d 1221, 1233, n. 8 (10th Cir. 1997).   The cases are numerous approving multipliers in this range.  See, e.g., Perry, et al. v. FleetBoston Financial Corp., 229 F.R.D. 105, 122-23 (E.D.Pa. 2005) (Multipliers from one to four are common, awards 1.5 multiplier); Florin v. Nationsbank of Georgia, 60 F.3d 1245, 1247 (7th Cir. 1995) (multiplier adjusted upward to 1.53 after trial court only used a 1.01 multiplier).   Any sort of multiplier within the range commonly accepted to account for the riskiness of this action puts the lodestar "check" above the fee requested in this case.

The fee requested falls well within the "benchmark" of 25% established by Camden I.  A "double check" of the amount based upon a lodestar analysis shows the fee to be consistent with what would be awarded on an hourly rate computation basis.  As such, a fee of $3,895,368.29 (after deducting expenses from the total

$4M requested) in this case is fair and reasonable under the circumstances, and should be awarded in this case.

## H.   **Barber Auto Sales is Entitled to an Incentive Award as a Class Representative.**

The settlement provides for a $10,000.00 incentive award to be paid to Barber Auto Sales, Inc. to compensate it for the time and effort expended in its roles as the class representative in this case.  This is to be paid in addition to the other obligations of the settlement.  "Courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."  Ingram v. Coca-Cola, Co., 200 F.R.D. 685, 694 (N.D.Ga. 2001).

No party has objected to the incentive award to be paid to Barber Auto Sales, Inc., nor could any objection stand.  Class Plaintiff answered written discovery, produced thousands of documents, was prepared for deposition, and was deposed twice in this case.  Under the law, Mr. Barber is entitled to some compensation for those efforts, and the $10,000.00 award requested is fair and reasonable.

## III.  CONCLUSION

For the foregoing reasons, Class Counsel requests this Court to enter an award of attorneys' fee and expenses of $4,000,000.00 to be paid to the law firm of Wiggins, Childs, Quinn & Pantazis, LLC in accordance with the parties'

Settlement Agreement and further directing that this award be distributed among

Class Counsel according to Class Counsel's fee and expense sharing agreements.

RESPECTFULLY SUBMITTED,

/s/ Brian M. Clark
Robert L. Wiggins, Jr.
Dennis G. Pantazis
Brian M. Clark
Attorneys for Plaintiffs

OF COUNSEL:
WIGGINS, CHILDS, QUINN & PANTAZIS, LLC
301 Nineteenth Street North
Birmingham, Alabama 35203
Telephone: (205) 314-0500
Facsimile: (205) 254-1500

Peter A. Grarnmas
LOWE & GRAMMAS, LLP
1952 Urban Center Parkway
Vestavia Hills, Alabama 35242
Telephone: (205) 380-2400
Facsimile: (205) 380-2408

James M. Corder, Jr.
ALEXANDER, CORDER, PLUNK, & SHELLY, P.C.
P.O. Box 1129
Athens, Alabama 35612
Telephone: (256) 232-1130
Facsimile: (256) 232-6699

Nicholas B. Roth
EYSTER KEY TUBB ROTH MIDDLETON & ADAMS, LLP
P.O. Box 1607
Decatur, Alabama 35601
Telephone: (256) 353-6761
Facsimile: (256) 353-6767

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the <u>30</u><sup>th</sup> day of November, 2011, I electronically

filed the foregoing with the Clerk of the Court using the CM/ECF system, which

will send notification of such filing to the following:

>Harlan I. Prater, IV
>LIGHTFOOT, FRANKLIN & WHITE, LLC
>The Clark Building
>400 North 20th Street
>Birmingham, Alabama 35203-3200
>
>Paul J. Murphy
>Barry Goheen
>S. Stewart Haskins
>KING & SPALDING LLP
>1180 Peachtree Street
>Atlanta, Georgia 30309

>/s/ Brian M. Clark
>Of Counsel