FILED

2011 Nov-30  PM 05:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

Harlan I. Prater, IV (PRATH7485)
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, Alabama 35203-3200
(205) 581-0700
(205) 581-0799 (facsimile)

Paul J. Murphy (Admitted pro hac vice)
Barry Goheen (Admitted pro hac vice)
S. Stewart Haskins (Admitted pro hac vice)
KING & SPALDING LLP
1180 Peachtree Street
Atlanta, Georgia  30309
Telephone:  (404) 572-4600
Facsimile:  (404) 572-5139

Counsel for Defendants
United Parcel Service, Inc.
Filed Jointly with Counsel for Plaintiff
Listed on the Signature Page

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BARBER AUTO SALES, INC.,** individually and on behalf of all persons similarly situated, | ) ) ) ) | |
| **Plaintiff,** | ) ) | **CIVIL ACTION NO.:** **5:06-CV-4686-IPJ** |
| **vs.** | ) ) | |
| **UNITED PARCEL SERVICE, INC.,** | ) ) ) | **CLASS ACTION** |
| **Defendant.** | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF SETTLEMENT

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................ 1

II.  SETTLEMENT BACKGROUND ............................................................................. 2

III.  SUMMARY OF KEY SETTLEMENT ISSUES ..................................................... 4

  A.  Settlement Class ............................................................................................. 4

  B.  Relief To Settlement Class Members ............................................................ 4

  C.  Settlement Notice ........................................................................................... 6

  D.  Receipt Of Opt-Outs And Objections ........................................................... 6

IV.  LEGAL STANDARDS ............................................................................................. 7

  A.  The Requirements For Certification Of A Rule 23(b)(3) Settlement Class Are Satisfied ......................................................................................................... 8

  B.  Notice To Class Members Was Best Notice Practicable And Reasonably Calculated To Apprise Class Members Of The Settlement, And CAFA Notice Was Also Implemented ..................................................................................... 8

    1.  Settlement Notice ................................................................................... 8

    2.  CAFA Notice ......................................................................................... 10

  C.  The Settlement Is Fair, Adequate, And Reasonable. ................................... 10

V.  ALL FACTORS SUPPORT FINAL APPROVAL ................................................. 11

  A.  The Factor of Likelihood Of Success At Trial Supports Final Approval. ........... 11

  B.  The Range Of Possible Recovery Factor Supports Final Approval. .................... 13

  C.  The Substantial Remedial And In-Kind Relief Provided By The Settlement Is Well Within The Range At Which The Settlement Is Fair, Adequate, And Reasonable. ........................................................................................................ 15

  D.  The Factor Of Complex, Costly, And Lengthy Litigation Supports Final Approval. ........................................................................................................... 17

  E.  The Class Members' Positive Reaction Supports Final Approval ........................ 19

VI.  THE HEASER OBJECTION LACKS ANY MERIT ............................................. 20

A.      The $12 Million Available To The Class Is Fair And Adequate To Compensate Class Members. ................................................................................... 21

B.      The In-Kind Relief Benefits The Class. ................................................... 23

C.      There Is No Evidence Of "Self-Dealing." ............................................... 25

D.      Heaser's Criticism Of The Notice Is Misplaced. .................................... 28

E.      The Settlement Is Fair, Adequate, And Reasonable Even Under The Standard Heaser Proposes. ...................................................................... 28

        1.      *"The Class Representatives And Class Counsel Have Been And Currently Are Adequately Representing The Class."* ............................................... 29

        2.      *"The Relief Offered To The Class ... Is Fair And Reasonable Given The Costs, Risks, Probability Of Success, And Delays Of Trial And Appeal."* 29

        3.      *"Class Members Are Treated Equitably (Relative To Each Other) Based On Their Facts And Circumstances And Are Not Disadvantaged By The Settlement Considered As A Whole."* ...................................................... 30

        4.      *"The Settlement Was Negotiated At Arm's Length And Was Not The Product Of Collusion."* .......................................................................... 30

VII.    CONCLUSION ............................................................................................... 31

CERTIFICATE OF SERVICE ....................................................................................... 33

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*,
   211 F.R.D. 457 (S.D. Fla. 2002)..................................................................20, 31

*Barber Auto Sales, Inc. v. United Parcel Serv., Inc.*,
   Docket No.10-10821-GG (11th Cir. June 8, 2011) (order granting stay)................................4

*Bennett v. Behring Corp.*,
   737 F.2d 982 (11th Cir. 1984) .................................................................12, 15, 29

*Bennett v. Behring Corp.*,
   96 F.R.D. 343 (S.D. Fla. 1982), *aff'd*, 737 F.2d 982 (11th Cir. 1984)....................................20

*Faught v. Am. Home Shield Corp.*,
   --- F.3d ---, No. 10-12496, 2011 WL 5119115 (11th Cir. Oct. 31, 2011) ..............................26

*Francisco v. Numismatic Guar. Corp. of Am.*,
   No. 06-61677-CIV, 2008 WL 649124 (S.D. Fla. Jan. 31, 2008)......................................18, 19

*Hillis v. Equifax Consumer Servs. Inc.*,
   Nos. 1:04-CV-3400-TCB, 107-CV-314-TCB, 2007 WL 1953464 (N.D. Ga. June 12,
   2007) .................................................................................................25, 31

*In re Bluetooth Headset Products Liability Litigation*,
   654 F.3d 935 (9th Cir. 2011) ....................................................................26, 27

*Lurns v. Russell Corp.*,
   604 F. Supp. 1335 (M.D. Ala. 1984) ...............................................................20

*Perez v. Asurion Corp.*,
   No. 06-20734-CIV, 2007 WL 2591180 (S.D. Fla. Aug. 8, 2007) ........................................25

*Petrovic v. Amoco Oil Co.*,
   200 F.3d 1140 (8th Cir. 1999) ......................................................................18

*True v. American Honda Motor Co.*,
   749 F. Supp. 2d 1052 (C.D. Cal. 2010) ..........................................................22, 23

*United States v. Alabama*,
   271 Fed. Appx. 896 (11th Cir. 2008)...................................................................8

*Waters v. Int'l Precious Metals Corp.*,
   190 F.3d 1291 (11th Cir. 1999) ......................................................................27

**STATUTES**

28 U.S.C. 1712(a) ........................................................................................24, 25

28 U.S.C. § 1715(b) ...........................................................................................11

Federal Aviation Administration Authorization Act of 1994 ("FAAAA") ............................15, 26

Defendant United Parcel Service, Inc. ("Defendant" or "UPS") and Plaintiff Barber Auto Sales, Inc. ("Plaintiff" or "Barber"), by and through their undersigned counsel, jointly submit this memorandum of law in support of their Joint Motion for Final Approval of Settlement in the above-captioned class action litigation.

## I.      INTRODUCTION

After nearly five years of hard-fought litigation, defendant United Parcel Service, Inc. and plaintiff Barber Auto Sales, Inc., have reached an agreement to compromise the claims in this case.  The Parties now jointly request that this Court grant final approval of the proposed Amended Settlement Agreement ("SA" or "Settlement Agreement"), submitted previously with the Joint Motion for Preliminary Approval filed on August 19, 2011.  The Settlement is fair, adequate, and reasonable and resolves all claims asserted in the above-captioned class action litigation against UPS, on behalf of all contracted UPS customers between May 15, 2006, and August 29, 2011, who paid adjusted shipping charges based on UPS audits, as more fully described in the Settlement Agreement.

On August 29, 2011, this Court entered its Preliminary Approval Order, which (1) certified the tentative Settlement Class under Federal Rule of Civil Procedure 23(b)(3), (2) preliminarily approved the Parties' Settlement Agreement, (3) approved and directed a plan for giving notice to Class Members, (4) appointed Class Counsel, and (5) appointed the Settlement Administrator.  That order also set deadlines for exclusion requests and objections to the Settlement as well as other interim deadlines leading to the final approval hearing on December 5, 2011.  In compliance with the Court's order, the Settlement Administrator, with the cooperation and assistance of the Defendant, has caused notice of this proposed Settlement to be sent to the Class members.  Additionally, notice under the Class Action Fairness Act ("CAFA")

was sent to the United States Attorney General and attorneys general in all 50 states and the District of Columbia.

The response to the Settlement has been overwhelmingly positive. Thousands of Class members have submitted claims, a small percentage of Class members have opted out, and only two Class members have filed one joint objection. The Parties and their counsel now respectfully request final approval of the proposed Settlement as a reasonable, bargained-for resolution of this contested case.

## II.   **SETTLEMENT BACKGROUND**

A short history of the litigation is offered below to illustrate the mediation and negotiation process that resulted in the Settlement Agreement. A more detailed account of the litigation and settlement negotiations was provided in the Parties' preliminary approval memorandum at 3-5 (Docket No. 152).[2]

Barber filed its class action complaint against UPS on November 15, 2006, and amended that complaint on February 20, 2007. The amended complaint alleged that UPS breached the "appropriate adjustment" provision of its customer contract by "increas[ing] the dimension sizes" when auditing packages that Barber shipped with UPS, thereby increasing Barber's shipping charges. *See* First Amended Class Action Compl. ¶¶ 11-12 (Docket No. 18). UPS sought and was granted a partial motion for judgment on the pleadings for certain claims. *See* Docket No. 34. Following class discovery, the Court granted Plaintiff's motion for class certification on September 29, 2009. *See* Docket No. 132. In February 2010, the Eleventh

---

[2] To avoid re-filing same documents with the Court, the Parties refer to the docket entries for the documents, orders, and exhibit materials that have been previously filed in this case. For example, the Parties will cite to the Settlement Agreement at __ (Docket No. 156), the preliminary approval memorandum as Prelim. Approval Mem. at __ (Docket No. 152), and the Order Granting Preliminary Approval of Proposed Settlement as Prelim. Approval Order at __ (Docket No. 158).

Circuit granted UPS permission to appeal the Court's class certification order.  *See* Docket No. 147.  After briefing on the UPS appeal, the Court of Appeals heard oral argument on January 26, 2011.  That appeal was pending when the Parties reached this Settlement, and the appeal is stayed while the Court reviews the Settlement.  *See Barber Auto Sales, Inc. v. United Parcel Serv., Inc.*, Docket No.10-10821-GG (11th Cir. June 8, 2011) (order granting stay).

The Parties engaged in two separate mediations with an independent and experienced mediator, Rodney A. Max.  During the settlement negotiations, the Parties continued to vigorously litigate until reaching a settlement on all claims.  The settlement process was contentious, beginning in 2008 with several unproductive meetings and conferences led by Mr. Max.  *See* Decl. of Rodney A. Max ¶ 2, attached hereto as Exhibit A.  In 2011, after the Eleventh Circuit heard oral argument on UPS's appeal of the class certification order, the Parties mediated again and were able to reach an agreement in principle to settle the Class claims.  *See* Decl. of Max, Ex. A ¶¶ 3-5.  Bruce Barber, a representative for the Plaintiff, was involved with the settlement negotiations and had the opportunity to discuss the settlement terms with Class Counsel before the Settlement was accepted by the Plaintiff.  *See* Decl. of Bruce Barber ¶ 2, attached hereto as Exhibit B.  After the Settlement was reached concerning both the monetary and injunctive relief to be provided to the Class, the Parties held a separate settlement conference to negotiate the issue of fees for Class Counsel.  The Parties did not discuss attorneys' fees before the claims of the Class were settled, and the attorneys' fees negotiation was also contentious.  *See* Decl. of Max, Ex. A ¶¶ 5-6.  The Parties' disagreement over fees threatened the entire negotiation process.  *Id.*  Ultimately, the Parties reached an impasse on the issue, which was only resolved after the mediator offered his proposal on attorneys' fees on a "take it or leave it" basis.  The Parties eventually agreed to accept the mediator's proposal.  *Id.*

After the Parties submitted their initial settlement to the Court for preliminary approval, the Parties modified the Settlement's governing law. The Court reviewed and approved this modification, resulting in the Settlement Agreement that this Court preliminarily approved on August 29, 2011. The Parties also made certain minor changes to the Claim Form, and those changes were filed with the Court and approved on September 9, 2011. *See* Docket No. 162.

## III.   SUMMARY OF KEY SETTLEMENT ISSUES

### A.   Settlement Class

The Settlement Class generally consists of all contracted UPS customers between May 15, 2006, and August 29, 2011, who shipped packages with UPS from one location in the United States to another location in the United States, provided UPS with dimensions for the packages, and had adjusted shipping costs as a result of a UPS audit of the package's dimensional weight.[3]

### B.   Relief To Settlement Class Members

The relief provided by the Settlement confers a substantial monetary benefit to the Class, in exchange for a limited and narrow release of the Class claims. A total of $12 million has been set aside for direct remedial relief of Class claims. A $2 million fund (the "Claims Made Fund") has been set aside for the payment of past claims, while $10 million has been earmarked for future relief (the "Dimensional-Weight Compensation Fund" or "Dim-Weight Fund"). Class members will receive relief from the Claims Made Fund upon submitting a valid Claim Form. This relief will be paid to Class members by check. Because the vast majority[4] of Class members continue to use UPS's shipping services, however, UPS is also offering an account credit, which confers the benefit of the Settlement without requiring Class members to go

---

[3] The complete Class definition, along with its exclusions, is found in the Preliminary Approval Order at 3-4 (Docket No. 158).
[4] Approximately 89% of Class members maintained valid accounts with UPS as of September 2011. *See* Decl. of Peter Coady ¶ 2, attached hereto as Exhibit C.

through the extra step of cashing a check.  Thousands of Class members have already elected this option.  *See* Decl. of Amy Lake ¶ 9, attached hereto as Exhibit D.  Accordingly, this Settlement is not a "coupon" settlement.

UPS has also agreed to provide substantial in-kind relief in the form of enhanced disclosures and other changes to its policies and practices, designed to assist UPS customers in avoiding future dimensional weight shipping charge corrections.  This element of relief, agreed to by UPS with the input of Plaintiff, directly addresses many of the claims made by Plaintiff in the litigation.   *See* Decl. of Barber, Ex. B ¶ 4.  These changes were made to UPS's three primary means of communications to its customers: the Tariff, the Rate and Service Guide, and the UPS.com website.  *See* Decl. of Peggy Gardner ¶ 3, attached hereto as Exhibit E.  The changes to the Tariff primarily reflect improved disclosures concerning UPS's right to audit packages and adjust shipping charges, as well as information regarding how to request an invoice adjustment.  *Id*. ¶¶ 4-6.  Changes to the Rate and Service Guide include detailed instructions on how to measure packages, including irregularly shaped packages, which are more often subject to dimensional weight adjustments.   *Id*. ¶ 7.  These instructions are also accompanied by illustrations demonstrating how to correctly measure packages to avoid adjustments.  *Id*.  The UPS.com website contains the same changes as to the Tariff and Rate and Service Guide, and also has new content to inform shippers of UPS's policies, including an article entitled "Avoid Billing Corrections at the Outset."  *Id*. ¶¶ 8-13.  Finally, the Worldship™ system instructions now clarify that shippers must enter "correct" dimensions to avoid a shipping charge correction.  Previously, shippers would sometimes enter random or "placeholder" dimensions (such as 1" x 1" x 1"), resulting in adjusted shipping charges.  *Id*. ¶ 14.

As an additional benefit to the Class, UPS has agreed to pay Class Counsel for their reasonable attorneys' fees, costs, and expenses, up to a total request of $4 million, subject to this Court's approval, and an incentive award payment to the Named Plaintiff of $10,000. UPS has also agreed to pay all reasonable costs of the Class Notice and administration with the Settlement of this Action, including but not limited to the fees and expenses of the Settlement Administrator, estimated at nearly $500,000. *See* Settlement Agreement at 17-18 (Docket No. 156); Decl. of Lake, Ex. D ¶ 11. Thus, the amounts set aside to pay the Class members' claims are not in any way reduced or impacted by the costs of administering the Settlement or by the payment of fees to Class Counsel.

## C.     Settlement Notice

The notice program, described by the Court's Preliminary Approval Order as the "best practicable under the circumstances," was implemented consistent with the timeline established by this Court. *See* Prelim. Approval Order at 6 (Docket No. 158). An official Settlement website, which posted the long-form notice and other Settlement documents, became operational on October 13, 2011. *See* Decl. of Lake, Ex. D ¶ 7. As of November 22, 2011, that website had received 69,849 main page hits. *Id.* On that same date, the Settlement Administrator established a toll-free telephone number for information regarding the Settlement. *Id.* ¶ 8. On October 13, 2011, email notices were disseminated to 636,514 Class members. *Id.* ¶ 5. On October 13, 2011, postcard notice was sent via First Class mail to 893,226 Class members. *Id.* ¶ 6. Returned mailed notices were re-sent with forwarding orders, if available, and returned email notices were sent via First Class mail. *Id.* ¶¶ 5-6. Each notice was in the form approved by the Court. *Id.*

## D.     Receipt Of Opt-Outs And Objections

The notice instructed Class members that unless they requested exclusion from the Settlement (or filed an objection) no later than November 7, 2011,[5] they would be bound by its terms.  Class members had ample time -- 25 days -- to file their objections or opt-outs.  Courts have found that notice received two weeks before the opt-out deadline complies with both Rule 23 and due process.  *See United States v. Alabama*, 271 Fed. Appx. 896, 901 (11th Cir. 2008) ("Rule 23 and due process only require that class members are provided notice of the terms of a settlement agreement in a manner that allows them to make a determination about whether or not the settlement serves their interests" and finding that two weeks' notice was sufficient to meet that standard).   Of the 1,579,057 Class members, 296 sent a timely opt-out request to the Settlement Administrator.  *See* Decl. of Lake, Ex. D ¶ 10.  Two Class members objected, filing only one objection.  No Class member objected to the length of time available to file opt-outs or objections.[6]   The Settlement Administrator's declaration enumerates all exclusion requests received.  *Id.*

## IV.  **LEGAL STANDARDS**

The Court should finally approve this class-action settlement because the requirements of Federal Rule 23(a) and (b) are met.  Furthermore, the notice program was carried out as the Court directed and was not only reasonably calculated to apprise Class members of the Settlement, but was also the best notice practicable under the circumstances.  Finally, the

---

[5] Under the Court's preliminary approval order, Class members had 75 days from the date of the order to request exclusion from the Settlement class.  Due to a clerical error, the Settlement Administrator inadvertently posted November 7, 2011 (rather than November 12) as the deadline to file opt-outs and objections, reducing the time for opt-outs and objections by four business days (November 12 fell on a Saturday).  *See* Decl. of Lake, Ex. D ¶ 10.  Nevertheless, the Parties consider all opt-outs and objections received on or before the later date, November 12, to be timely.

[6] While the sole objection received from Brandy and Noah Heaser is without merit, its length alone (a 37-page brief) shows that Class members had adequate time to review the Settlement and either object or opt-out.

7

Settlement is fair, adequate, and reasonable, and the single, joint objection to the Settlement lacks merit and, therefore, should not prevent final approval.

### A.       The Requirements For Certification Of A Rule 23(b)(3) Settlement Class Are Satisfied.

As the Parties set forth in their preliminary-approval memorandum, this Court has already certified the Class as meeting the requirements for class certification in a litigated context, and found that the requirements of Federal Rule of Civil Procedure 23(a) were met and that the predominance requirement of Rule 23(b)(3) was also met. *See* Docket No. 132. As the Court noted in its Preliminary Approval Order, the "class definition for settlement purposes is substantially the same." Prelim. Approval Order at 3 (Docket No. 158). The Court also noted that "the Federal Rule of Civil Procedure 23 factors [we]re still present" at the time of preliminary approval and that certification of the proposed Settlement Class was appropriate under Rule 23. *Id.* Thus, it is appropriate that the Court confirm its prior findings that this Settlement Class meets all the Rule 23 requirements for approval.

### B.       Notice To Class Members Was Best Notice Practicable And Reasonably Calculated To Apprise Class Members Of The Settlement, And CAFA Notice Was Also Implemented.

In accordance with the notice program outlined in the Parties' preliminary approval memorandum and as directed by this Court's Preliminary Approval Order dated August 29, 2011, the Parties implemented a comprehensive notice program designed to ensure that the Settlement Class members were provided with notice that meets the requirements of Rule 23. UPS also provided timely CAFA notice to federal and state officials.

#### 1.       Settlement Notice

The notice program was originally filed with the Court on August 22, 2011, as Exhibits C and D to the Joint Motion for Preliminary Approval. The notice program included the creation

8

of a Settlement website and two pieces of written notification to Class members: (1) a postcard mailed to Class members notifying them of their rights under the Settlement and directing them to the www.barberclassaction.com website and/or a toll-free telephone number for further information; and (2) a long-form notice, containing basic information about the Settlement, as well as a series of questions and answers regarding the Settlement and claims administration process. The long-form notice was both emailed to potential Class members and posted to the Settlement website. Both the postcard notice and long-form notice were in the form approved by the Court.

The notice program, described by the Court's Preliminary Approval Order as the "best practicable under the circumstances," was implemented consistent with the timeline established by this Court. *See* Prelim. Approval Order at 6 (Docket No. 158). On October 13, 2011, email notice was effected on 636,514 Class members for whom UPS had email address information. *See* Decl. of Lake, Ex. D ¶ 5. For those emails that were returned as undeliverable, Class members were sent notice by mail. *Id.* Additionally, 893,226 Class members were sent notice via USPS First-Class mail on October 13, 2011. *Id* ¶ 6.

The Settlement website, located at www.barberclassaction.com, went "live" on October 13, 2011, and is scheduled to remain operational through payment and administration of all claims made pursuant to the Settlement. *See* Decl. of Lake, Ex. D ¶ 7. As of November 22, 2011, the Settlement website had received 69,849 main page hits. *Id.* The Settlement Website includes the Claim Form, instructions on how to submit the Claim Form, the Settlement Agreement in its entirety, and other documents from the litigation including the Preliminary Approval Order. The Claim Form could be completed online or Class members could request a written Claim Form from the Settlement Administrator. The written Claim Form is one page in

length, and only requires Class members to submit their name, address, UPS account number, and amount of adjusted shipping charges.  Class members were also given the option on the Claim Form of receiving a benefit check or an account credit.  Class members were asked to certify their eligibility for participation in the Class and veracity of claim via signature.  The Claims process was purposefully kept simple to avoid placing any undue burden on Class members to obtain the relief available under the Settlement.

In addition to the Settlement website, a toll-free telephone number (the "Settlement Hotline") was offered to Class members to answer any questions about the Settlement, litigation, or Claims process.  The telephone number was operational 24 hours a day, 7 days a week, beginning on October 13, 2011.  In addition to receiving information about the Settlement from the Settlement Hotline, Class members could also request a Claim Form or ask to speak to a customer service representative about the Settlement.  As of November 22, 2011, the Settlement Hotline had received 4,608 calls.  *See* Decl. of Lake, Ex. D ¶ 8.

### 2.    CAFA Notice

UPS caused notice under CAFA, 28 U.S.C. § 1715(b), to be sent to the United States Attorney General and to the attorneys general in all 50 states and the District of Columbia. CAFA notices were sent on September 7, 2011, after the entry of the Preliminary Approval Order on August 29, 2011.  The CAFA notice included six documents on a computer CD, including among others, the amended Complaint, Joint Motion for Preliminary Approval, the Amended Settlement Agreement, and Preliminary Approval Order.  *See, e.g.,* Letter from S. Stewart Haskins to the Attorney General of the United States (Sept. 7, 2011), attached hereto as Exhibit F.

### C.    The Settlement Is Fair, Adequate, And Reasonable.

In its Preliminary Approval Order, this Court found that the terms of the Settlement Agreement met the fair, adequate, and reasonable standard at that stage in the proceedings.  *See* Prelim. Approval Order at 5 (Docket No. 158).  Federal Rule of Civil Procedure 23(e) further governs the final approval process, and requires three steps: preliminary approval by the Court, dissemination of class notice, and final approval after a hearing by the Court.  *See* David F. Herr, Annotated Manual for Complex Litigation (Fourth) §§ 21.632-.635 (2011).  The first two steps have been completed by the Court's Preliminary Approval Order of August 29, 2011, and after the Settlement Administrator effectuated notice on the Class.  *See* Docket No. 158; Decl. of Lake, Ex. D ¶¶ 5-6.  The final hearing, scheduled for December 5, 2011, will be the opportunity for those who object to the Settlement to have their objections heard by the Court.  Only one objection has been filed, and it demonstrably lacks merit.  *See* Section VI herein.  Thus, all necessary steps for final approval will have been completed by the time the Court considers this motion.

## V.   <u>ALL FACTORS SUPPORT FINAL APPROVAL</u>

Under Federal Rule of Civil Procedure 23, class action settlements must be "fair, adequate, and reasonable."  Fed. R. Civ. P. 23(e)(2).  Courts in the Eleventh Circuit have typically considered the following six factors in analyzing whether a settlement meets that standard: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved."  *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).  Each of these *Bennett* factors, as discussed below, overwhelmingly support the final approval of this Settlement.

### A.   **The Factor of Likelihood Of Success At Trial Supports Final Approval.**

Perhaps the most important *Bennett* factor in determining that the Settlement is fair, adequate, and reasonable is the fact that UPS had potentially meritorious defenses to the Class claims that could have prevented the Class from obtaining any recovery in the case whatsoever. Barber alleged in its Complaint that UPS breached each Class member's shipping contract by making inappropriate billing adjustments during the audit process. UPS vigorously denied that allegation and defended the accuracy of its measurements. For example, UPS introduced evidence that the measurement devices used by UPS during its audits utilize state-of-the-art laser measurement technology that is widely accepted throughout the industry and is used globally by FedEx, DHL, TNT, and other transportation companies, and is far more accurate and reliable than human measurement. Weights and measures officials around the world have certified these devices as appropriate for use in measuring packages for the calculation of shipping charges. UPS also argued that it subjects all of its devices to rigorous accuracy testing prior to installation, and then tests daily to confirm continued accuracy. In addition, UPS pointed out that any customer who believes that an incorrect billing adjustment has been imposed can notify UPS of the situation and request a refund. Finally, the record evidence showed that some customers measure packages incorrectly and others customers merely "fill in the blank" with implausible package dimensions (such as 1" x 1" x 1"). Thus, while Plaintiff believes that its claims in the case had merit, it is certainly possible that a jury could have determined that the customers' measurements were incorrect and that UPS's measurements were accurate, thus defeating Plaintiff's claims in the case.

In addition to these defenses on the merits, UPS had several potentially valid defenses to class certification. UPS argued that to determine whether any adjustment was "appropriate" requires a package-by-package resolution of numerous individual issues, such as: whether the

customer correctly measured the package and provided those dimensions to UPS; whether UPS measured the package dimensions correctly (UPS has 3,400 employee auditors and 2,735 different measuring devices); whether the customer disputed the adjustment within 180 days of receiving the invoice as required under the shipping agreements (many of these disputes are oral); and whether the customer actually paid the billing adjustment (many customers had billing adjustments waived or received refunds).  As a result, UPS argued that Barber's proposed class would literally require examining each of these issues for hundreds of millions of different shipping transactions and that common issues cannot predominate where the claims depend on such individualized proof.  Indeed, presumably, it was due to concern over the propriety of class certification in this case that the Eleventh Circuit granted UPS's petition under Rule 23(f) to appeal the class certification order.

In short, even after nearly five years of litigation, it is impossible to say with any certainty whether the Court's class certification order would have been affirmed on appeal or whether Plaintiff would have ultimately prevailed at trial.  Even if the case was properly certified as a class action, there was, by no means, any guarantee that the Class would either avoid summary judgment or win at trial.  A loss at the summary judgment stage or at trial would mean that the Class would receive nothing.  While Barber believes its case had merit, UPS maintains that there were substantial obstacles to the recovery of the Class, and a jury may have accepted UPS's position.  Therefore, this factor strongly favors approval of the Settlement.

## B.    The Range Of Possible Recovery Factor Supports Final Approval.

While the potential recovery of the Class theoretically could have included up to the amount of improper shipping charge corrections (exclusive of attorneys' fees and costs) that each Class member had incurred, this potential recovery must be placed in proper context.  To recover

all of the shipping charge corrections that UPS assessed, the Class must show that each package dimension input by every Class member is correct and that UPS's audit measurements were incorrect. At trial, UPS believes it would be entitled to test these assumptions concerning each individual Class member and, as discussed above, UPS had substantial evidence that its measurements were accurate and that many Class members' measurements were inaccurate. Moreover, UPS has always maintained that many customers already received refunds of their shipping charge corrections. While Plaintiff disagrees, UPS contends that it is possible that the Class may not be able to establish any damages at all.

Moreover, there is substantial disagreement whether Class members could prove that their measurements were correct and that the UPS measurements were not. UPS asserts that such a showing would require proof as to what the actual dimensions of the package were at the time the package was shipped, and therefore the Class members would have a difficult time establishing their damages for any package. Furthermore, UPS asserts that any damages shown would be subject to reduction to account for variations in UPS's standard shipping rates based on time period, service option, and customer. In Plaintiff's view, the adjustment cost for each package would be the amount of damages for that package. Under the Settlement, Class members may submit claims for 100% of their assessed shipping charge corrections. If the total amount of submitted Claims exceeds the amount of the Claims Made Fund, then Class members may not recover dollar-for-dollar. Even if the Class members' recovery is a percentage of their potential damages, however, such a fact does not render the Settlement unfair or inadequate: indeed, as the Eleventh Circuit held in *Bennett* -- "compromise is the essence of settlement." *Bennett,* 737 F.2d at 986.

14

In addition, it is significant that continued litigation of this breach of contract action could not have created or provided for the prospective relief agreed to by UPS.  Even if Plaintiff and the Class had prevailed at trial on their breach of contract claim, their recovery would be limited to money damages for simple breach of contract under the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), without any enhancements under state law such as equitable or non-contractual damages.  *See* Docket No. 34.  Although Plaintiff disagrees with these limitations (which remained an appealable issue), this restriction on recovery was established at the district court level at the time of the Settlement.  By negotiating this Settlement, Plaintiff was able to secure changes in the written contract governing shipments with UPS and changes in UPS's procedures concerning dimensional weight shipping charge corrections that were likely unavailable through continued litigation.  The changes UPS agreed to make through the Settlement directly address concerns raised in the Plaintiff's Complaint, and if adhered to completely, should substantially reduce the number of customers who receive a dimensional weight shipping charge adjustment.

C.    **The Substantial Remedial And In-Kind Relief Provided By The Settlement Is Well Within The Range At Which The Settlement Is Fair, Adequate, And Reasonable.**

UPS has agreed to reimburse Class members for some portion of their shipping charge corrections between May 15, 2006 and August 29, 2011.  A $2 million Settlement claims fund has been set aside for payment of these Class claims, with an additional $10 million fund available for future claims for refunds of dimensional-weight shipping charge corrections.  Class members have the option of receiving their reimbursement via a refund by check or a credit on their UPS account.  Because the Settlement provides the option for a payment by check, it is clearly not a "coupon" settlement.  While Class members may opt to receive a check if they

15

choose, the overwhelming majority continue to use UPS's shipping services.  Thus, offering an account credit to Class members also confers the benefit of the Settlement without requiring the Class member to go through the extra step of cashing a check.  It is a convenience of which many Class members have availed themselves.  As of November 22, 2011, 22% of the claims have opted to receive a credit in lieu of a refund.  *See* Decl. of Lake, Ex. D ¶ 9.

In addition to these Claims funds, UPS has agreed to pay the attorneys' fees of Class Counsel (up to $4 million), an incentive award to the Plaintiff, and the costs of notice and Settlement administration, which will approach $500,000.  *See* Decl. of Lake, Ex. D ¶ 11.  The payment of these fees and costs will not reduce the Class members' recovery, which adds another $4.5 million to the total value of the Settlement to the Class.

UPS has also agreed to substantial in-kind relief in the form of enhanced disclosures and other changes in its policies and procedures.  UPS will provide customers with more detailed instructions on its website and in its Rate and Service Guide on several issues related to dimensional-weight shipping.  The UPS.com website will include more information on how customers should properly measure packages, particularly unusually shaped or other "problem" packages, how to determine a package's billable weight, how to prepare packages for shipping, and tips for avoiding shipping charge adjustments.  *See* Decl. of Gardner, Ex. E ¶¶ 9-13.  UPS has also updated its UPS Worldship™ instructions, which are used by its franchise business partners such as The UPS Store® and Mail Boxes Etc.®  *Id.* ¶ 14.  Furthermore, UPS has clarified the process for which customers can dispute adjusted shipping charges, both on its website and in its customer contract.

This relief obtained by Plaintiff in the Settlement will have a direct and positive impact on millions of UPS customers, including members of the Class, by enabling customers to more

accurately predict their shipping costs and avoid shipping charge corrections for dimensional weight. This relief is of tremendous benefit, as many UPS customers and Class members (including the Plaintiff) are small businesses without the resources to have litigated the claims asserted in this lawsuit on their own. Such a large-scale benefit conferred upon the entire Class is exactly the type of relief that Rule 23 was intended to procure, and such relief can be considered in evaluating the merits of a settlement. *See Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1151 (8th Cir. 1999) (considering injunctive relief in approval of a settlement). Given the significant benefits -- both monetary and non-monetary -- conferred upon the Class by the Settlement, the relief falls well within the range at which the Settlement is fair, adequate, and reasonable. This factor also clearly weighs in favor of approval.

### D.    The Factor Of Complex, Costly, And Lengthy Litigation Supports Final Approval.

This is not a case in which a complaint was filed and the parties hastily reached a settlement to avoid litigation soon after the class complaint was filed. The terms of the Settlement Agreement were reached with the assistance of a sophisticated mediator with uncommon experience in resolving complex cases and class actions, who after several attempts[7] was able to help engineer a resolution. *See* Decl. of Max, Ex. A ¶ 5. This case was litigated for nearly five years, including extensive class discovery, heavy motion and procedural practice, and two interlocutory appeals to the Eleventh Circuit. The central factual issues between the Parties remain hotly contested, but a resolution was reached because of the extraordinary efforts of the mediator, and the good faith efforts of counsel for the Parties.[8] Here, both Barber and UPS have had the opportunity to conduct extensive class discovery (which necessarily involves an

---

[7] The Parties engaged in multiple settlement negotiations as well as informal conferences, meetings, and discussions.

[8] A full recitation of the litigation and settlement negotiation process can be found in the Parties' preliminary approval memorandum at 3-5 (Docket No. 152).

assessment of the merits) and to fully evaluate the facts and relative strength of their positions before deciding to resolve the case by agreement.

Of course, the Parties could have continued litigating the case, but continued litigation is "inherently" uncertain. *See Francisco v. Numismatic Guar. Corp. of Am.,* No. 06-61677-CIV, 2008 WL 649124 at *8, *10 (S.D. Fla. Jan. 31, 2008) (discussing the "inherent uncertainty of complex litigation" and "the prolonged risks of continued litigation" in granting final approval of a class action settlement). As discussed above, UPS had several defenses to Plaintiff's claims. Each of these defenses could have foreclosed Plaintiff's claims, and Plaintiff's counsel would have been required to invest even more time and resources in the case to attempt to address UPS's defenses. The Settlement was reached during the pendency of the Eleventh Circuit's review of the class certification order, and a reversal would mean that Barber could only act on its own behalf to pursue its claims. The rest of the Class also would have had to act accordingly if it wished to recover anything as a result of alleged wrongs they suffered.

These factors added procedural complexity to this case, sparking even more uncertainty about its outcome. As such, they weighed heavily in the ultimate decision to settle this case, and are reflected in the terms of the Settlement. When the certainty of the Settlement benefits is weighed against the risks and time involved in the Eleventh Circuit appeal and possible trial on the merits (and then another possible appeal), the proposed Settlement terms of $12 million, attorneys' fees, and injunctive relief are more than reasonable. *See Francisco,* 2008 WL 649124 at *11 (finding that the "risks and expense of continued litigation weigh strongly in favor of approval of the settlement's immediate benefits"). Consideration of the complexity, costs, and uncertainties of continuing this litigation weighs heavily in favor of approving the Settlement as reasonable and in the best interest of the Class.

### E.    The Class Members' Positive Reaction Supports Final Approval.

Overwhelmingly, the Class has responded positively to the Settlement.  Even though the deadline for filing claims is nearly two months away, over 12,000 Class members already have agreed to participate in the Settlement benefits and have sent Claim Forms to assert their rights to a share of the Claims Made Fund.  *See* Decl. of Lake, Ex. D ¶ 9.  Only one objection to the Settlement has been made. Only 296 Class members submitted timely requests for exclusion, just .02% of the Class. *Id.*

Courts in this Circuit have found that a low number of objections indicates that a settlement is fair and should be approved.  *See Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) ("a small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness"); *Lurns v. Russell Corp.*, 604 F. Supp. 1335, 1337 (M.D. Ala. 1984) (a "factor to be considered in assessing the fairness, adequacy and reasonableness of the settlement is the number of objectors"); *Bennett v. Behring Corp.*, 96 F.R.D. 343, 353 (S.D. Fla. 1982) (recognizing that the number of objectors is a factor to be considered in approving the settlement), *aff'd*, 737 F.2d 982 (11th Cir. 1984). Here, there is but one objection.  Significantly, this objection is not to the sufficiency of the Settlement amount -- either the $2 million Claims Made Fund or the $10 million Dim-Weight Fund -- and the objection admits that the Parties have the right to settle for the case for "any reasonable amount."   *See* Objection of Brandy and Noah Heaser at 5 (Docket No. 166). Nowhere does the objection claim that the Settlement itself is not fair, adequate, or reasonable, and it concedes that the Court would be within its discretion to approve the Settlement. *See id.* at 31 (heading VII entitled "If the Court Approves This Settlement").  The other points raised by the Objection are meritless as discussed in Section VI immediately below.

## VI.   THE HEASER OBJECTION LACKS ANY MERIT

Of the 1,579,057 Class members, only two have submitted an objection to the Settlement. These Class members, Noah and Brandy Heaser[9] (hereinafter "Heaser" or the "Objector")[10], are represented by Daniel Greenberg, who is an affiliate with a group known as the Center for Class Action Fairness.[11]   The Center appears to specialize in objecting to class action settlements.   In just over a two-year period, the Center has objected to nearly twenty class action settlements. Susan Beck, *A Conversation With Class Action Objector Ted Frank*, THE AMERICAN LAWYER ONLINE, March 4, 2011.

The Heaser objection ("Objection") fundamentally mischaracterizes the Settlement. Heaser mistakenly claims that the Class benefit is only $2 million. Heaser wrongly claims that the remedial relief is a "coupon" of no benefit to the Class, and objects to the in-kind relief as "contempl[ation] that the defendant will continue the supposedly impermissible practices" prompting the original litigation.   Finally, Heaser objects to Class Counsel's proposed fee award,

---

[9] The Parties note that a Noah Heaser of the same address as the objector was convicted of mail fraud in 2005 and was ordered to pay $136,967.10 in restitution.   *See* Petition for Warrant or Summons for Offender under Supervision at 1 in *United States v. Heaser*, Case No. 05-CR-125-C (W.D. Wis. Jan. 9, 2008), attached hereto as Exhibit G; Judicial Review Hearing Tr. at 4:2 (Docket No. 13), *United States v. Heaser*, Case No. 05-CR-125-C (W.D. Wis. Mar. 6, 2008), attached hereto as Exhibit H.   Mr. Heaser subsequently had his probation revoked for failure to comply with the restitution plan and was ordered to imprisonment. *See id.* at 16:14-17:25.

[10] The Heasers, the Parties presume, are married.   But since they have filed one objection, for the sake of simplicity, they are referred to in the singular with the masculine pronoun.

[11] The Court's Preliminary Approval Order required any attorney who represents an objector and who "intends to seek fees and expenses from anyone other than the objectors" to file certain information concerning the fee request "not later than sixty days after the date of the order." Prelim. Approval Order at 10.   Counsel for the Objector ignores this mandate, claiming that they have not provided the information because they do "not currently intend to seek fees and expenses" and will only do so if they materially improve the Settlement.   Objection at 34 n.15. This explanation does not relieve Objector's counsel from their obligation to provide the information required by the Court's order and, therefore, the Objector's counsel should be precluded from later seeking any fees in connection with the Settlement.

alleging that the Parties' agreement on fees is "self-dealing." Heaser's objections are without merit and should not dissuade the Court from final approval of the Settlement.

**A.     The $12 Million Available To The Class Is Fair And Adequate To Compensate Class Members.**

The Settlement provides for $2 million in the Claims Made Fund to compromise past claims as well as $10 million to resolve future claims. The Objector argues that the Class consists only of former customers of UPS, while the Dim-Weight Fund can only benefit future UPS customers; therefore, the Dim-Weight Fund cannot benefit the Class. *See* Objection at 17. This characterization is simply wrong. Class members benefit from *both* funds. The Claims Made Fund is not limited to former customers. Moreover, the vast majority of the Class members are still active UPS customers, and thus will receive the benefit of the Dim-Weight Fund. *See* Decl. of Coady, Ex. C ¶ 2 (stating that 89% of Class members still have UPS accounts). While it is true that all UPS-contracted customers will have access to the Dim-Weight Fund,[12] that does not preclude the Class from accessing the fund as well. As with the Claims Made Fund, Class members simply have to file a valid claim to recover from the Dim-Weight Fund. The ability of other customers to access the Dim-Weight Fund does not negate the overall value of the fund or its benefit to Class members, nor does it suggest that the Settlement in itself is unfair in any way.

Heaser also incorrectly attempts to label the Dim-Weight Fund a "coupon" settlement, but this argument is also misplaced. The Dim-Weight Fund is not a discount off some future purchase. Instead, the Dim-Weight Fund will fully reimburse Class members for any future claims until the fund is exhausted. Heaser's emphasis on the fact that customers must "do future business" with UPS to receive the benefit of the Dim-Weight Fund ignores the fact that the vast

---

[12] Limiting access to the Dim-Weight Fund to only Class members would be difficult to monitor, costly to UPS, and create an administrative burden. *See* Decl. of Coady, Ex. C ¶ 3.

majority of UPS customers -- and Class members -- are "repeat" customers who ship packages with UPS on a frequent and on-going basis.  Thus, an account credit is a valuable benefit to the majority of Class members -- it is essentially a cash equivalent.  This makes the relief available from the Dim-Weight Fund markedly different from "coupon" settlements like the one in *True v. American Honda Motor Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010), the case which Objector cites to support the rejection of settlements that require class members to "do business again."  In *True*, a class action claim was settled with the primary benefit being a $500 or $1,000 rebate offered for customers on the purchase of another Honda vehicle in the next eighteen months.  The court rejected that settlement, as it required customers who had just sued after the purchase of a car to buy another car from the same company to receive the value of the settlement.  *See True*, 749 F. Supp. 2d at 1075.

Simply put, the Dim-Weight Fund is not a "discount" off a future purchase.  Class members will not ship packages with the hope of getting a dimensional-weight shipping charge correction so that they can draw on the benefit of the Dim-Weight Fund.  Rather than being a mere incentive to do business again, the Dim-Weight Fund is a future benefit available should Class members believe they have suffered an injury.  While it is true that Class members will continue to ship with UPS in order to receive the benefit of the Dim-Weight Fund, most have already chosen to do so.  The Plaintiff, Barber, is still a UPS customer and continues to ship packages with UPS.  Like Barber, the majority of Class members still maintain accounts with UPS and thus have already chosen to "do business again" with UPS, even without the benefits of the Settlement.

Furthermore, while Class members will have access to the Dim-Weight Fund for future claims of shipping charge adjustments, it is significant that the Settlement only releases claims as

of the date of the Preliminary Approval Order (August 29, 2011). Therefore, Class members are free to pursue any future claims they may have against UPS, notwithstanding their ability to receive compensation though the Dim-Weight Fund. In other words, Class members are receiving this valuable benefit without surrendering any additional rights in return.

Heaser further argues that because the Dim-Weight Fund is a "coupon" settlement, it cannot be fully counted as a Class benefit for the purposes of calculating the fee award, noting that CAFA mandates that only the "redeemed" value of a coupon settlement can be used in calculating attorneys fees. *See* 28 U.S.C. 1712(a) ("If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed."). While Class Counsel's motion for attorneys' fees addresses this argument, the Parties note here that, unlike a coupon settlement, the Dim-Weight Fund has no expiration date by which Class members must file their claims. The fund will continue to pay claims until it is exhausted, meaning that the entire fund will be "redeemed." No portion of the $10 million Dim-Weight Fund will revert to UPS. Thus, it is appropriate to count the total $10 million value of the Dim-Weight Fund as a Settlement benefit.

**B.    The In-Kind Relief Benefits The Class.**

Heaser argues that the injunctive relief in the form of enhanced disclosures and information is illusory, claiming that the "benefit of this injunctive relief to class members who have decided to do business with another shipper instead of UPS is exactly zero." Objection at 11 (Docket No. 166). Again, Heaser ignores the fact that most of the Class members continue to ship with UPS. Thus, the overwhelming majority of the Class will benefit from this injunctive relief. Furthermore, even those Class members who do not currently maintain active accounts with UPS may decide to do business with UPS again, and nothing precludes those customers

23

from shipping with UPS in the future and enjoying this benefit. But because many Class members already continue to do business with UPS, in some cases shipping hundreds of packages a day, the injunctive relief is of tremendous benefit to the Class as a whole.

Heaser also claims that both the in-kind relief and the Dim-Weight Fund contemplate that UPS will continue "the supposedly impermissible practices that originally prompted this lawsuit." *Id.* at 1. Once again, Heaser misunderstands the nature of the Settlement. UPS has always maintained its right to audit packages and adjust costs if necessary to comply with the agreed-upon contract terms, and the Settlement does not deprive UPS of that right. UPS also steadfastly maintains that the results of the audit process are accurate and the shipping charge corrections for dimensional weight are appropriate. The value of the prospective relief in the Settlement is that UPS now provides more disclosure on how the auditing provision of its customer contract is implemented and allows customers to seek a refund (up to $10 million in total) if they feel that a mistake was made during the audit process and UPS has incorrectly made a shipping charge adjustment.

Ultimately, UPS and its customers have an aligned interest in avoiding shipping adjustments. Because adjusted shipping costs reflect the recoupment of real costs for UPS, as well as employee time spent auditing and adjusting invoices, UPS has no incentive to encourage incorrect invoicing of shipping costs only to adjust them later. Likewise, customers who wish to accurately predict their shipping costs have a desire to avoid such charges. Both UPS and its customers would like appropriate costs to be reflected on a package's original invoice. These increased disclosures advance those mutual interests and therefore benefit those Class members

who continue to ship with UPS.[13]  Moreover, it is highly unlikely any of these benefits could be obtained in the litigation, as the Court has already ruled that such equitable relief was preempted by the FAAAA.

## C.      There Is No Evidence Of "Self-Dealing."

Heaser objects to the Settlement on the grounds that it is self-dealing because of three factors that relate to Class Counsel's fees: (1) a purported disproportionate benefit to Class Counsel; (2) a "clear sailing" provision; and (3) a "kicker" clause, which reverts unawarded fees to UPS rather than to the Class.  These objections are more fully addressed in Class Counsel's fee request, but the Parties state here that Heaser is again mischaracterizing the benefits of the Settlement.  The Settlement's true value to the Class is over $16.5 million -- $2 million in the Claims Fund, $10 million in the Dim-Weight Fund, up to $4 million in attorneys' fees, the costs of Settlement administration (nearly $500,000) and the incalculable value of the injunctive relief.  *See* Decl. of Lake, Ex. D ¶ 11.  Payment of up to $4 million in fees to Class Counsel is not a "disproportionate" benefit to the Class, but in line with Eleventh Circuit precedent that a fee award of less than 25% of a settlement's value is typically appropriate.  *See Faught v. Am. Home Shield Corp.*, --- F.3d ---, No. 10-12496, 2011 WL 5119115 at *7 (11th Cir. Oct. 31, 2011) ("this court has often stated that the majority of fees in these cases are reasonable where they fall between 20-25% of the claims").  Thus, the Parties' agreement with respect to Class Counsel's fees is not evidence of "self-dealing," nor does it provide any basis to object to the Settlement.

---

[13] The monetary value of this injunctive relief is not easily quantifiable in this case given the large number of class members and the volume of shipments, but in other cases courts have considered the value of injunctive relief for purposes of determining a settlement's total value. *See Perez v. Asurion Corp.*, No. 06-20734-CIV, 2007 WL 2591180 at *4 (S.D. Fla. Aug. 8, 2007) (noting the value of injunctive relief to determine value of settlement for attorneys' fee calculations); *Hillis v. Equifax Consumer Servs. Inc.*, Nos. 1:04-CV-3400-TCB, 107-CV-314-TCB, 2007 WL 1953464 at *11 (N.D. Ga. June 12, 2007) (noting that "the injunctive relief also has significant value for the Settlement Class").

Furthermore, the case relied upon by Heaser to support his claim of "self-dealing" is readily distinguishable from this Settlement in several important respects. In the case Objector cites, *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011), the Ninth Circuit remanded a class settlement so that the district court could consider several factors in deciding whether to approve the fee award at issue. The Ninth Circuit expressly noted that the fee award was not necessarily inappropriate, even though it was eight times the amount of the settlement benefit. *Id.* at 945 ("we cannot say the disproportion between the fee award and the benefit obtained for the class was *per se* unreasonable").

There are several distinctions between *Bluetooth* and this Settlement, the most glaring of which is that the *Bluetooth* class members did not receive any monetary recovery from the settlement. Instead, the *Bluetooth* settlement provided for a cy pres payment of $100,000 with a fee award of $800,000. *Bluetooth*, 654 F.3d at 938. The *Bluetooth* settlement also contained a general release by the class as opposed to the limited release of claims from the class members in this Settlement. *Id.* at 939. In *Bluetooth,* the Ninth Circuit also noted that "collusion" may be more likely in cases in which a settlement is reached pre-class certification, a consideration that does not apply here. *Id.* at 946. Moreover, the parties in *Bluetooth* failed to present evidence that the fee was reached only after settlement benefits for the class were obtained. *Id.* at 938. In contrast, the fee award here was proposed by the mediator and agreed upon by both Parties only after settling the class relief. *See* Decl. of Max, Ex. A ¶¶ 5-6. Thus, the Ninth Circuit's decision in *Bluetooth* is clearly distinguishable from this Settlement and provides no support for Heaser's claim of "self-dealing."

Heaser also objects to the fact that UPS has agreed not to oppose Class Counsel's fee award, but such "clear sailing" provisions are appropriate and have been approved by the

Eleventh Circuit. *See Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1293, 1300 (11th Cir. 1999) (holding that district court did not abuse discretion in approving settlement and awarding attorneys fees with a "clear sailing" provision, and noting that other courts have determined that such agreements are essential to settlement, because "the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged") (internal citations omitted).  It is appropriate and reasonable that UPS would agree not to oppose Class Counsel's fee request on the basis that it was a negotiated-for and agreed-upon number by both Class Counsel and UPS's counsel.  There would be little point to agreeing upon a fee award if that agreement is later subject to revocation or objection.

Finally, the Heasers object to the "kicker" provision, which purportedly reverts unawarded Class Counsel fees to UPS, and not to the Class members.  This objection does not apply here because it ignores the difference between "common-fund" settlements and settlements in which a fee agreement is reached separately and independently of the class recovery, like this case.  In this Settlement, the Class benefit -- $12 million in total, plus injunctive relief and Settlement administration costs -- will not be reduced or otherwise impacted should Class Counsel not receive the entire $4 million in fees.  This Settlement has been structured such that the Class relief is wholly independent of fees for Class Counsel.  Lower fees awarded to Class Counsel would not increase the Class benefit, nor would higher fees for Class Counsel decrease the Class benefit.  Indeed, structuring the Settlement otherwise could create a conflict of interest between the Class and Class Counsel.  Thus, the agreement of UPS and Plaintiff on fees is not a "kicker" provision, nor is it evidence of self-dealing.  If anything, the separate negotiation of attorneys' fees after the negotiation of the Class benefit ensured that the interests of the Class were not overlooked or shortchanged in favor of Class Counsel's fee award.

**D.      Heaser's Criticism Of The Notice Is Misplaced.**

Without expressly objecting to the adequacy of the Settlement funds, Heaser suggests that the notice did not provide Class members with knowledge as to the eventual amount of their recovery.  This attempt to collaterally attack the sufficiency of the notice is without any basis. The notice was approved by the Court and provided Class members with sufficient information to decide whether they wanted to take part in the recovery.  Class members were notified of the following:

> UPS has agreed to establish a Settlement Fund of $2.0 million from which identifiable Settlement Class members may receive account credits or payments. The amount of such account credits or payments cannot be determined at this time.  However, it will be based on the number of people in the Settlement Class, the number of claims received, and the amount of adjusted charges paid by each Class member as the result of UPS' audit.

Prelim. Approval Mem. Exhibit D at 5 (Docket No. 152-4).  Thus, Class members were informed that the amount of their recovery was presently unknown.  Class members were notified as to the total amount, nature, and benefits of the Settlement.  No other information was required.  The Claims Period will run for some time after the final approval of the Settlement.  Indeed, it would be onerous to require that Class members submit Claims before it is even known whether the Settlement will be approved.  The information in the notice was sufficient for Class members to decide whether to receive the Settlement benefits in whatever amount, or to opt-out if they were not satisfied with the potential recovery.   Indeed, after receiving the notice, 296 Class members timely opted out of the Settlement.

**E.      The Settlement Is Fair, Adequate, And Reasonable Even Under The Standard Heaser Proposes.**

As Heaser notes on page 26 of his Objection, the Eleventh Circuit test for assessing the fairness of class-action settlements is found in *Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir.

1984).   The Settlement is analyzed under the *Bennett* factors throughout Section IV of this memorandum, and the analysis clearly shows that the Settlement is fair, adequate, and reasonable.   Heaser admits that the *Bennett* factors are the standard that has been adopted by the Eleventh Circuit, but Heaser does not analyze the Settlement under these factors, much less argue that the Settlement fails to meet these factors.   Instead, Heaser urges this Court to adopt the American Law Institute's tests for fairness of settlements, without offering any reason why this Court should apply a new standard that has not been referenced, let alone adopted, by the Eleventh Circuit.   In any event, even considering these ALI standards, found on page 27 of the Objection, the Settlement should be approved.

> **1.** *"The class representatives and class counsel have been and currently are adequately representing the class."*

A class action can only be certified if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). By previously certifying the class in this action, the Court has already found that the Class representatives and counsel are adequately representing the Class.  *See* Order (Docket No. 132); *see also* Prelim. Approval Order at 3-4.  Thus, this factor weighs in favor of approval.

> **2.** *"The relief offered to the class… is fair and reasonable given the costs, risks, probability of success, and delays of trial and appeal."*

As detailed in Sections IV.A to IV.D and V.B above, the relief offered in this Settlement is substantial.  In particular, the extensive remedial and injunctive benefits of the Settlement are fair and adequate, particularly when viewed in light of the tremendous costs to Plaintiff and the Class in a trial on the merits, the risk of class decertification by the Eleventh Circuit, the highly disputed nature of the issues, and the risks and delays of trial on the merits and potential further appeal after nearly five years of litigation.  As such, this factor weighs in favor of approval.

3.    *"Class members are treated equitably (relative to each other) based on
their facts and circumstances and are not disadvantaged by the
settlement considered as a whole."*

Class members will receive a recovery based on the amount of adjusted shipping charges

each Class member paid.  Should the total number of claims received surpass the $2 million

available in the fund, Class members will be paid a percentage of their claims, calculated such

that every valid Claim submitted receives relief.  Relief from the Dim-Weight Fund will be paid

in the order claims are submitted to UPS, until the Fund is exhausted.  The injunctive relief

obtained by the Settlement benefits the Class as a whole, and additionally benefits all customers

of UPS.  All Class members are treated the same under the Settlement, and the injunctive and

forward-looking relief will benefit the Class members who remain customers of UPS equally.

Class members have been and continue to be treated equitably vis-à-vis one another, and none

can be said to be disadvantaged in any way by the Settlement.

4.    *"The settlement was negotiated at arm's length and was not the product of
collusion."*

As discussed in Section II above, the Settlement in this case was reached only after nearly

half a decade of litigation.  As detailed by the mediator, Rodney Max, the mediation process was

attempted several times with fruitless results.  *See* Decl. of Max, Ex. A ¶¶ 2-4.  Only with the

active and dogged assistance of an experienced mediator and the approval of the Plaintiff were

the Parties able to reach an agreement.  *See* Decl. of Max, Ex. A; Decl. of Barber, Ex. B.  As

detailed in Section VI.C of this memorandum, there is no evidence that even suggests that the

Parties colluded in order to settle this case, and the Parties' ability to finally come to a negotiated

settlement should be granted deference by the Court.  *See Hillis*, 2007 WL 1953464 at *9 ("It has

been repeatedly recognized that settlements are highly favored in the law and will be upheld

whenever possible.") (internal citations and quotations omitted).  When there is no indication of

fraud or collusion, courts should not substitute their own judgment for that of counsel. *See Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) (absent fraud, a court "should be hesitant to substitute its own judgment for that of counsel").

## VII.    <u>CONCLUSION</u>

For the reasons stated above, the Settlement is fair, adequate, and reasonable.  Plaintiff and Defendant jointly and respectfully request that this Court grant final approval of the Settlement.

Respectfully submitted this 30th day of November, 2011.

*/s/ S. Stewart Haskins*
One of the Attorneys for Defendant
United Parcel Service, Inc.

*/s/ Peter A. Grammas*
One of the Attorneys for Plaintiff
Barber Auto Sales, Inc.

(signatures continue next page)

**COUNSEL FOR DEFENDANT UNITED PARCEL SERVICE, INC:**

Harlan I. Prater, IV (PRATH7485)
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, Alabama 35203-3200
(205) 581-0700
(205) 581-0799 (facsimile)

Paul J. Murphy (Admitted *pro hac vice*)
Barry Goheen (Admitted *pro hac vice*)
S. Stewart Haskins (Admitted *pro hac vice*)
KING & SPALDING LLP
1180 Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5139

**COUNSEL FOR PLAINTIFF BARBER AUTO SALES, INC:**

James M. Corder, Jr. Esq.
ALEXANDER, CORDER, PLUNK, &
SHELLY, P.C.
Attorneys at Law
P.O. Box 1129
Athens, Alabama 35612

Peter A. Grammas, Esq.
E. Clayton Lowe, Jr., Esq.
LOWE & GRAMMAS, LLP
Attorneys at Law
1952 Urban Center Parkway
Vestavia Hills, Alabama 35242

Dennis G. Pantazis, Esq.
WIGGINS, CHILDS, QUINN &
PANTAZIS, LLC
Attorneys at Law
The Kress Building
301 19th Street North
Birmingham, Alabama 35203

Nicholas B. Roth
EYSTER KEY TUBB ROTH
MIDDLETON & ADAMS, LLP
P.O. Box 1607
Decatur, AL 35601

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of November, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

James M. Corder, Jr. Esq.
ALEXANDER, CORDER, PLUNK, &
SHELLY, P.C.
Attorneys at Law
P.O. Box 1129
Athens, Alabama  35612

E. Clayton Lowe, Jr., Esq.
Peter A. Grammas, Esq.
LOWE & GRAMMAS, LLP
Attorneys at Law
1952 Urban Center Parkway
Vestavia Hills, Alabama  35242

Dennis G. Pantazis, Esq.
WIGGINS, CHILDS, QUINN &
PANTAZIS, LLC
Attorneys at Law
The Kress Building
301 19th Street North
Birmingham, Alabama  35203

Nicholas B. Roth
EYSTER KEY TUBB ROTH
MIDDLETON & ADAMS, LLP
P.O. Box 1607
Decatur, AL 35601

*/s/ S. Stewart Haskins*

33